Thomas M. WHITE, John McKenzie, Frederick Hamiel, Tyrone Hamilton, and South Burlington County Branch, National Association for the Advancement of Colored People, Plaintiffs,

v.

Col. Carl A. WILLIAMS, individually, Department of Law and Public Safety—Division of State Police, Peter Verniero, individually, John J. Farmer, Jr., in his official capacity as Attorney General of the State of New Jersey, Col. Clinton Pagano, individually, Col. Michael Fedorko, in his official capacity as Acting Superintendent of the New Jersey State Police, New Jersey Turnpike Authority, John and Jane Does 1–99, individually and in their official capacities, John and Jane Roes 1–99, individually and in their official capacities, and John and Jane Moes 1–99, individually and in their official capacities, Defendants.

Civil Action No. 99–CV–2240(JAP).

United States District Court,
D. New Jersey.

Jan. 9, 2002.

William H. Buckman, Moorestown, NJ, for plaintiffs.

Stefan Presser, ACLU Foundation of Pennsylvania, PA, Justin T. Loughry, Loughry and Lindsay, Moorestown, NJ, Alan L. Yatvin, Howard D. Popper, Popper & Yatvin, Philadelphia, PA, David Rudovsky, Kairys, Rudovsky, Epstein, Messing & Rau, Philadelphia, PA, Seth F. Kreimer, Philadelphia, PA, for Thomas White, John McKenzie.

Michael R. Cole, Benjamin Clarke, Paulette L. Pitt, DeCotiis, Fitzpatrick, Gluck, Hayden & Cole, Teaneck, NJ, for Division of State Police, Col. Clinton Pagano, Col. Michael Fedorko and Attorney General John J. Farmer.

George W. Fisher, Zuckerman & Fisher, Princeton, NJ, for Col. Carl A. Williams.

Samuel P. Moulthrop, Andrew M. Conteras, Riker, Danzig, Scherer, Hyland & Perretti, Morristown, NJ, for New Jersey Turnpike Authority.

Robert A. Mintz, Adam N. Saravay, McCarter & English, Newark, NJ, for Justice Peter G. Verniero.

## OPINION

PISANO, District Judge.

## I. INTRODUCTION

This case arises out of the ongoing scrutiny of the New Jersey State Police and its practice of racial profiling on the New Jersey Turnpike.[1] Plaintiffs Thomas White, John McKenzie, Frederick Hamiel, Tyrone Hamilton and the South Burlington County Branch, National Association for the Advancement of Colored People ("NAACP") filed this lawsuit alleging various claims against defendants, the Department of Law and Public Safety—Division of State Police ("State Police"), the New Jersey Turnpike Authority ("Turnpike Authority"), Col. Carl A. Williams, Col. Clinton Pagano, Col. Michael Fedorko, Justice Peter Verniero and Attorney General John J. Farmer, Jr., related to the racial profiling conducted by the State Police on the New Jersey Turnpike ("Turnpike").

---

1. There is a vast body of racial profiling litigation ongoing in the State of New Jersey. *See, e.g., Brown v. Philip Morris, Inc.,* 250 F.3d 789 (3d Cir.2001); *Longoria v. New Jersey,* 168 F.Supp.2d 308 (D.N.J.2001); *Kadetsky v. Egg Harbor Tp. Bd. of Educ.,* 164 F.Supp.2d 425 (D.N.J.2001); *South Camden Citizens in Action v. New Jersey Dep't of Envtl. Protection,* 145 F.Supp.2d 505 (D.N.J.2001); *Hernandez v. Beeler,* 129 F.Supp.2d 698 (D.N.J.2001); *State v. Velez,* 167 N.J. 626 (2001); *State v. Moore,* 164 N.J. 557, 753 A.2d 1151 (2000); *State v. Harvey,* 159 N.J. 277, 731 A.2d 1121 (1999); *State v. Payton,* 342 N.J.Super. 106, 775 A.2d 740 (App.Div.2001); *State v. Halsey,* 340 N.J.Super. 492, 774 A.2d 693 (App.Div. 2001); *State v. Francis,* 341 N.J.Super. 67, 775 A.2d 79(App.Div.2001); *State v. Yanovsky,* 340 N.J.Super. 1, 773 A.2d 711 (App.Div. 2001); *State v. Jones,* 167 N.J. 627, 772 A.2d 930 (2001); *State v. Chapman,* 167 N.J. 624, 772 A.2d 928 (2001);; *State v. Hogan,* 336 N.J.Super. 319, 764 A.2d 1012 (App.Div. 2001); *State v. Ross,* 335 N.J.Super. 536, 763 A.2d 281 (App.Div.2000); *State v. Williamson,* 335 N.J.Super. 544, 763 A.2d 285 (App.Div. 2000); *State v. Velez,* 335 N.J.Super. 552, 763 A.2d 290 (App.Div.2000); *State v. Hampton,* 333 N.J.Super. 19, 754 A.2d 567 (2000); *State v. Carty,* 332 N.J.Super. 200, 753 A.2d 149 (App.Div.2000); *State v. Ballard,* 331 N.J.Super. 529, 752 A.2d 735 (App.Div.2000); *State v. Maryland,* 327 N.J.Super. 436, 743 A.2d 876 (App.Div.2000); *Davis v. New Jersey Dep't. of Law & Public Safety, Division of State Police,* 327 N.J.Super. 59, 742 A.2d 619 (Law Div.1999).

Plaintiffs' amended complaint contains five counts. Count one is brought pursuant to 42 U.S.C. § 1983 and alleges that defendants, Williams, Pagano and Verniero abridged plaintiffs' constitutional rights; Count two alleges that defendants, Williams, Pagano and Verniero acted with racial animus and were motivated by their "desire to injure, oppress, and intimidate plaintiffs because of their race" in violation of 42 U.S.C. § 1981; Count three alleges that defendants Williams, Pagano and Verniero, conspired to violate plaintiffs' civil rights in violation of 42 U.S.C. § 1985; Count four alleges that defendants, Williams, Pagano, Verniero, the State Police and the Turnpike Authority, "had knowledge of the discrimination and other violations of constitutional rights perpetrated on minorities, including plaintiffs, by their subordinates, but neglected and failed to prevent said wrongful acts when they had the power to do so" in violation of 42 U.S.C. § 1986; and Count five seeks injunctive relief, pursuant to 42 U.S.C. § 2000d (Title VI) to preclude racial profiling and to impose broad restraints and remedial measures.

Plaintiffs seek the following relief: (1) class certification; (2) a declaratory judgment that the defendants' actions, policies and practices deprived plaintiffs of their rights under the Fourth and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 2000d; (3) an order permanently enjoining defendants, their employees "and all persons acting in concert with them from stopping, searching, questioning and/or detaining motorists" without probable cause on New Jersey Highways based on their minority status; (4) an order compelling the State Police and the Turnpike Authority to "take prompt, appropriate and effective correc-

tive measures ... to prevent any policies, patterns, or practices that encourage, teach, train, and/or condone" arrests, stops, searches and other law enforcement action based upon an individual's race or ethnic background; (5) an order directing the State Police and the Turnpike Authority to implement a disciplinary system to punish those who continue to engage in or condone arrests, stops or other law enforcement action based upon an individual's race or ethnic background; (6) an order compelling the State Police and the Turnpike Authority to implement a record keeping system to gather statistical information concerning the race of all individuals stopped, detained, searched and arrested by the State Police; (7) compensatory, punitive and treble damages, as well as damages allowed under 42 U.S.C. §§ 1981, 1983, 1985, 1986 and 2000d; (8) reasonable attorneys' fees and court costs, as well as fees and expenses under 42 U.S.C. § 1988; and (9) any other "award, equitable or prospective injunctive relief allowed by statute, or pursuant to the equitable and just power of the Court."

This Court exercises original jurisdiction over these federal subject matter claims pursuant to 28 U.S.C. § 1331.

Pending before this Court are motions submitted by various defendants including[2]: (1) a motion to dismiss by defendants State Police, Pagano, Fedorko and Farmer; (2) a motion to dismiss by defendant Verniero; and (3) a motion for judgment on the pleadings as to plaintiffs' disparate impact claims, and a motion for summary judgment on the injunctive relief claims by the Turnpike Authority.

Plaintiffs commenced this action on May 14, 1999. An Amended Complaint was filed on June 22, 1999. On November 3,

---

**2.** Defendant Williams has not filed any motions in this matter. Defendant Turnpike Authority has not made any motions concerning Count Four (§ 1986).

1999, Judge Irenas placed this matter on administrative suspension pending the outcome of class certification issues in the related State Court case *Morka v. State of New Jersey*, No. L–8429–97 (N.J.Super.Ct.Law.Div. Oct. 5, 2000). After the Superior Court denied class certification in *Morka*, this case was reopened on January 25, 2001. On April 3, 2001, it was reassigned to the undersigned.

On November 14, 2001, this Court entered a consent order dismissing with prejudice Counts two (§ 1981), three (§ 1985) and four (§ 1986) as to defendant Pagano and Count four (§ 1986) as to defendant State Police. Finally, on November 19, 2001, counsel for defendant Williams entered an appearance.

The Court decides the remaining motions without oral argument pursuant to Fed.R.Civ.P. 78. Defendants' motions are granted in part and denied in part. Verniero's and Pagano's motions to dismiss Count one (§ 1983) are denied. Verniero's motion to dismiss Counts three and four (§§ 1985, 1986) is denied. Verniero's motion to dismiss count two (§ 1981) is granted. Finally, Count five (§ 2000d), seeking injunctive relief, is dismissed with prejudice as duplicative of the consent decree in *United States v. State of New Jersey*, No. 99–CV–5970(MLC).

## II. STATEMENT OF FACTS

This is a putative class action in which the plaintiffs assert that defendants have engaged in a practice, policy and custom of racial profiling on the Turnpike. *See* Peter Verniero and Paul Zoubek, *Interim Report of The State Police Review Team Regarding Allegations of Racial Profiling*, (Apr. 20, 1999). ("Interim Report"). Racial profiling is defined as "any action taken by a state trooper during a traffic stop that is based upon racial or ethnic stereotypes and that has the effect of treating minority motorists differently than non-minority motorists." *Id.* at 5.

Plaintiffs Thomas White, John McKenzie and Frederick Hamiel are all African-American residents of Pennsylvania. White and McKenzie are both retired prison guards. Hamiel is a newspaper account executive. Plaintiff Tyrone Hamilton is an African-American resident of New Jersey, employed as Union County Juvenile Detention Officer. Plaintiff NAACP "is an association formed and operated to protect and defend the constitutional rights of its members and the community of persons of color in and around Burlington County, New Jersey." (amend. comp.¶ 5)

Defendant Turnpike Authority is an independent public agency responsible for the operation and control of the Turnpike. Defendant State Police is the agency charged with the responsibility of patrolling the Turnpike. Defendant Col. Carl A. Williams, now retired, was the Superintendent of the State Police between March 1994 and February 1999. (def. brief at 2) Williams' predecessor was Defendant Col. Clinton Pagano, who was the Superintendent from October 1975 until February 1990; he is also retired. (def. brief at 2) Williams was replaced by Defendant Col. Michael Fedorko, who served as Acting Superintendent between February 1999 and November 1999; he is also retired. (def. brief at 2) Defendant Peter Verniero was the Attorney General of New Jersey from July 1996 through May 15, 1999. Verniero left that position when he was confirmed as an Associate Justice of the New Jersey Supreme Court. Defendant John J. Farmer, Jr. succeeded Verniero as New Jersey's Attorney General.

### A. *State v. Soto,*

The State Police's practice of racial profiling became a predominant public issue

after a Superior Court Judge in Gloucester County declared, in a published opinion, that the State Police endorsed, on at least a *de facto* basis, a policy of racial profiling. *State v. Soto*, 324 N.J.Super. 66, 84, 734 A.2d 350 (Law Div.1996). This finding was made in the context of suppression motions brought by seventeen minority criminal defendants who had been arrested on drug possession charges after being stopped on the Turnpike. *Id.* The court found that the defendants established a *prima facie* case of selective enforcement that the state was unable to rebut. *Id.* at 69, 734 A.2d 350. Therefore, the court suppressed all of the seized evidence. *Id.*

This decision was based in part on statistics which established the existence of institutional racism within the State Police. The moving defendants compiled these statistics by creating a database of Turnpike traffic stops made by troopers working out of the Moorestown State Police Barracks between April 1988 and May 1991. *Id.* These statistics revealed that African–Americans were 4.85 times more likely to be stopped on the Turnpike than non-African-Americans. *Id.* at 69–71, 734 A.2d 350.

The court also considered various aspects of trooper training. *Id.* at 78, 734 A.2d 350. Specifically, the court considered the testimony of Sgt. Brian Caffrey, who was the assistant supervisor of the Drug Interdiction Training Unit ("DITU") between 1987 and 1992. *Id.* at 79, 734 A.2d 350. He testified that the major purpose of DITU was to teach trainees how to talk their way into a vehicle after, not before, a motor vehicle stop in order to effectuate patrol-related arrests. *Id.* He recalled that trainees were taught that "ethnicity is something to keep in mind" when conducting drug interdiction. *Id.* at 80, 734 A.2d 350. He also testified that trainees were taught that Hispanics are

involved in drug-trafficking and were shown a film entitled "Operation Pipeline" where the vast majority of those arrested were Hispanic. *Id.* In addition, another film, entitled "Jamaican Posse" was presented to the trainees. In this film, only African–Americans were depicted as drug traffickers. *Id.*

The court also considered statements that Col. Pagano made in response to a news report entitled "Without Just Cause," which aired on WWOR Television in 1989 and was among the earliest media reports of racial profiling. *Id.* at 81, 734 A.2d 350. Col. Pagano stated that "[violating the rights of motorists was] of serious concern [to him], but nowhere near the concern that I think we have got to look to in trying to correct some of the problems we find with the criminal element in this State," and "the bottom line is that those stops were not made on the basis of race alone." *Id.* at 81–82, 734 A.2d 350.

In videotaped remarks shown to all troopers after the airing of the WWOR report, Col. Pagano stated that "[w]hen you put on this uniform, you leave your biases and your prejudices behind." *Id.* Col. Pagano concluded his remarks by directing the troopers to "keep the heat on" and then assured them "... here at Division Headquarters we'll make sure that when the wheels start to squeak, we'll do whatever we can to make sure that you're supported out in the field....Anything that goes toward implementing the Drug Reform Act is important. And, we'll handle the squeaky wheels here." *Id.* at 82, 734 A.2d 350.

The State initially filed an appeal arguing that African-American motorists are stopped more often than white motorists because "they drive in a manner to make themselves stand out from other drivers." (amend.comp.¶ 35) However, on April 22, 1999, in light of the high profile Ho-

gan/Kenna Turnpike shooting, *see, infra,* sub-point B, Attorney General Verniero withdrew the appeal and admitted that the practice of racial profiling was real. *See,* Interim Report at 2. The *Soto* appeal was withdrawn two days after the release of the Interim Report. *See, infra,* sub-point C.

## B. The Turnpike Shooting

On April 23, 1998, troopers John Hogan and James Kenna were on routine traffic patrol on the Turnpike when they stopped a 1997 Dodge Caravan in the vicinity of interchange 7A for traveling 74 mph in a 55 mph zone. *See* Tom Haydon and Brian T. Murray, *Troopers Retrace Turnpike Shooting: Police Fired at van, injuring three, Probe follows report of attack on officers,* Newark Star–Ledger, Apr. 25, 1998. Traveling in the van were four college-age African–American men from New York who were traveling to a college basketball tryout in North Carolina. *Id.* The troopers allege that as they approached the vehicle, on foot after pulling it over, the van lunged at them in reverse and "clipped" trooper Hogan and knocked him to the ground. *Id.* Thereafter, the two troopers fired eleven shots into the van striking three of its occupants. *Id.* As the shooting occurred, the van slammed into the front of the police cruiser and crossed into traffic and only came to rest after slamming into another car. *See* Kate Coscarelli, *Lawyer: Van hit trooper accidentally,* Newark Star–Ledger, Apr. 26, 1998.

As a result of this shooting, in May 1999, Hogan and Kenna were suspended without pay. *See* Kathy Barrett Carter, *Two troopers accused of faking records will go on trial Nov. 13,* Newark Star–Ledger, Apr. 13, 2001. Both troopers are facing criminal charges relating to the shooting itself and also for falsely reporting the race of stopped minority drivers as white. *Id.*

## C. The Interim Report

In response to the Turnpike Shooting and Verniero's "realization" that racial profiling existed in New Jersey, Verniero prepared the Interim Report, which was released on April 20, 1999. (Interim Report, at p. 1) The Interim Report concedes that the State Police engaged in racial profiling on the Turnpike. It explains that "[t]he phenomena of racial profiling and other forms of disparate treatment of minorities that we describe in this Report are not just a matter of perception: the evidence we have compiled clearly shows that the problem is real." *Id.* at 57. The Report found that "[t]he use of stereotypes is revealed in the fact that minority motorists have been treated differently than non-minority motorists during the course of traffic stops on the New Jersey Turnpike." *Id.* at 4. It added that 27% of stops involved African–Americans; 6.9% involved Hispanics; and 3.9% involved Asians. *Id.* at 26. The difference in treatment between various racial groups was attributed to troopers who abused their duties by failing to focus on minority motorists' constitutional rights. *Id.* at 33–34.

The Report concluded that once stopped, minority motorists were subject to consent searches at much higher rates than white motorists. *Id.* at 6. It also found that minority motorists were arrested at a disproportionate rate as compared to white motorists. *Id.* at 29. Between 1996 and 1998, 68% of arrests on the Turnpike were of minorities. *Id.*

In an effort to remedy racial profiling, the Interim Report established a number of new policies and procedures to be for the State Police to implement. *Id.* at 82. The Report acknowledged that other steps had previously been taken to eradicate this

problem, including the establishment of Standard Operating Procedures ("SOPs") which required troopers to have a reasonable, articulable suspicion that evidence of a crime would be found prior to asking for permission to search a vehicle. *Id.* at 87. The SOPs also required troopers to keep written records of all consent searches. *Id.* Troopers were also required to report the racial characteristics of all individuals involved in traffic stops to the dispatcher, and to keep track of this information in their log book. *Id.* Also, the State Police provided a number of in-service training programs to explain to troopers that racial profiling was not an acceptable technique of crime investigation. *Id.* Further, video cameras were installed in State Police cars to provide conclusive evidence of a trooper's conduct during motor vehicle stops. *Id.*

The Interim Report implemented the following actions: (1) an updated statewide drug enforcement policy, *Id.* at 92; (2) the quarterly publication of State Police statistics, *Id.* at 94; (3) establishment of an "early warning system" and enhanced computerization of records to detect the disparate impact on minority citizens of individual state troopers, *Id.;* (4) the issuance of revised standard operating procedures for traffic stops, *Id.* at 96; (5) the development of practical stop criteria to be used by troopers in exercising their discretion in selecting which vehicles to stop, *Id.* at 98; (6) the issuance of new SOPs for consent searches to reaffirm existing policy that consent searches could only be conducted when a trooper has a reasonable articulable suspicion that the search would uncover evidence of a crime, *Id.* at 100; (7) a case-by-case review of all consent search data from 1997 and 1998 to determine whether the existing reporting criteria and SOPs were complied with; *Id.* at 102; (8) the development of enhanced training to implement the report, *Id.;* (9) the estab-

lishment of criteria for summoning drug-detection equipment and dogs, *Id.* at 104; (10) the establishment of a new procedure requiring troopers to inform the dispatcher of his or her intent to conduct a probable cause "automobile exception" search before conducting the search, *Id.* at 104; (11) the establishment of criteria for making custodial arrests, *Id.* at 105; (12) making Deputy Attorneys General ("DAGs") and Assistant Prosecutors available twenty-four hours a day to answer troopers' questions concerning search and seizure, custodial interrogation and related issues, *Id.* at 106; (13) the creation of a system for DAGs and County Prosecutors to notify the State Police of any suppression of evidence, as well as any downgrading or pleas offered to defendants as a result of the anticipated suppression of evidence, *Id.* at 106; (14) the development of an inventory and impoundment policy to prevent its use as a pretext for a vehicle search, *Id.* at 107; (15) the creation of interim internal affair procedures for racial profiling allegations, *Id.* at 108; (16) the creation of a plan for uniform handling of racial profiling challenges in litigation, *Id.* at 109; (17) the creation of a committee to provide legislative initiatives to further prevent racial profiling, *Id.;* and (18) the development of a reliable benchmark for statistics concerning the race and ethnicity of those traveling on the Turnpike, *Id.* at 110.

### D. The Consent Decree

In order to resolve the claims in a lawsuit threatened by the U.S. Department of Justice ("DOJ"), the State of New Jersey entered into a Consent Decree requiring vast changes in State Police operations. The Consent Decree, which incorporated many of the proposals of the Interim Report, was approved by the Honorable Mary Little Cooper of this Court, on December 30, 1999. *See United States v.*

*State of New Jersey & Div. of State Police of the New Jersey Dep't of Law & Pub. Safety,* No. 99–5970 (D.N.J. Dec. 30, 1999)("Consent Decree"). The Consent Decree specifically enjoins the State and the State Police from "engag[ing] in a pattern or practice of conduct . . . that deprives persons of rights, privileges, or immunities secured or protected by the Constitution or laws of the United States." *Id.* at 45–46. The Consent Decree contains a disclaimer that the State does not condone the practice of racial profiling, and it contains a number of extensive and costly remedial measures that the State agreed to undertake to remedy the profiling problem. *Id.* at 9–47.

The Consent Decree can only be enforced by the DOJ. *Id.* at 24. It specifically states that "[n]othing in this Consent Decree shall be construed to impair the right of any person or organization to seek relief against the State or the State Police for its conduct or the conduct of state troopers." *Id.* at 45. The decree provides the terms for its expiration; however, it must remain in effect for at least five years, and it may not be dissolved unless the State is found to be in substantial compliance with its terms for two consecutive years. *Id.* at 46–47.

At its core, the Consent Decree requires the State to develop and implement a computerized "Management Awareness Program" ("MAP") designed to "identify and modify potentially problematic behavior" and to "promote best practices" among its troopers. *Id.* 18. The program database must include the following information concerning all motor vehicle stops:

1. name and identification number of trooper(s) who initiated the stop;

2. name and identification number of trooper(s) who actively participated in the stop;

3. date, time, and location of the stop;

4. time at which the stop commenced and at which it ended;

5. license number/state of stopped vehicle;

5A. description of stopped vehicle;

6. the gender and race/ethnicity of the driver, and the driver's date of birth if known;

7. the gender and race/ethnicity of any passenger who was requested to exit the vehicle, frisked, searched, requested to consent to a vehicle search, or arrested;

8. whether the driver was issued a summons or warning and the category of violation (i.e., moving violation or non-moving violation);

8A. specific violations cited or warned;

9. the reason for the stop (i.e., moving violation or non-moving violation, other [probable cause/BOLO]);

10. whether the vehicle occupant(s) were requested to exit the vehicle;

11. whether the vehicle occupant(s) were frisked;

12. whether consent to search the vehicle was requested and whether consent was granted;

12A. the basis for requesting consent to search the vehicle;

13. whether a drug-detection canine was deployed and whether an alert occurred;

13A. a description of the circumstances that prompted the deployment of a drug detection canine;

14. whether a non-consensual search of the vehicle was conducted;

15. whether any contraband or other property was seized;

15A. a description of the type and quantity of any contraband or other property seized;

16. whether the vehicle occupant(s) were arrested, and if so, the specific charges;

17. whether the vehicle occupant(s) were subjected to deadly, physical, mechanical, or chemical force;

17A. a description of the circumstances that prompted the use of force; and a description of any injuries to state troopers and vehicle occupants as a result of the use of force;

18. the troopers's race and gender; and

19. the trooper's specific assignment at the time of the stop (on duty only) including squad.

*Id.* at 9–10. The MAP is also required to include information concerning whether the stop was video recorded, information on civilian complaints and evidence of positive performance, reports on the use of force associated with motor vehicle stops; on-duty and off-duty criminal arrests and criminal charges; civil suits involving alleged misconduct by troopers both on and off-duty (if involving allegations of racial bias, physical violence or threats of violence), and information concerning the implementation of interventions and training information. *Id.* at 18.

The Consent Decree requires all information attributable to individual troopers be made available to them, if requested in writing, on an annual basis.. *Id.* at 19. Further, the database must be able "to search and retrieve numerical counts and percentages for any combination of the information and to run reports for different time periods and for individual troopers, squads or stations." *Id.* MAP reports shall be prepared on a regular basis for individual troopers, stations, and squads for use in performance reviews. *Id.* at 21.

The Consent Decree also requires the State Police to develop a system to accurately compile statistics concerning the ethnicity of persons traveling on the Turnpike so that the MAP data can be better evaluated. *Id.* at 22.

The Consent Decree mandates the implementation of quarterly reviews of individual state troopers to ensure that they are performing their duties in accordance with the Consent Decree's provisions. *Id.* at 20. It also requires the creation of a Professional Standards Bureau ("PSB") within the State Police to protect the department's integrity by properly investigating and resolving misconduct complaints. *Id.* at 27. All misconduct complaints are to be investigated by the PSB. The decree requires the PSB to attempt to complete all misconduct investigations within forty-five days of assignment to an investigator. *Id.* at 32.

To aid in community relations, the Consent Decree requires troopers to provide their identification to any civilian who requests it. *Id.* at 23. It requires the development of a system to inform civilians of ways to file complaints or other feedback concerning an individual trooper's performance, including the creation of a toll-free telephone hotline available to citizens to file complaints twenty-four hours a day. *Id.* at 24. It also requires the State Police to develop community outreach programs to inform civilians of State Police procedures. *Id.*

In addition, the Consent Decree requires the development of training, both at the academy for new recruits and for existing troopers, to prevent racial profiling and to ensure compliance with the new requirements. *Id.* at 34. It specifically mandates annual in-service training on Fourth Amendment and cultural diversity issues.

In addition, the Consent Decree requires the State to prepare semiannual public reports containing relevant racial

profiling statistics compiled by the MAP. *Id.* at 39. Finally, it requires the appointment of an Independent Monitor to oversee its implementation. *Id.* at 40. The Independent Monitor is required to provide quarterly reports during the first year, and semiannual reports thereafter. *Id.* at 44.

## E. Plaintiffs' Individual Claims

### i.) McKenzie

McKenzie alleges that in October 1997, he was traveling southbound on the Turnpike, in the vicinity of interchange 6, when he was stopped by an unidentified white trooper who indicated that he was driving too slowly. (amend.comp.¶ 23) The trooper ordered McKenzie and his girlfriend to get out of the vehicle and then searched the vehicle's glove compartment. The trooper released McKenzie and his girlfriend after detaining them for approximately fifteen minutes. McKenzie was not issued a citation.

### ii.) White

White alleges that in mid-May 1998, he was traveling northbound on the Turnpike when he was stopped near interchange 7 by an unidentified white trooper for driving erratically. (amend.comp.¶ 21) The trooper inspected White's license, registration and insurance policy and then instructed him to open his vehicle's trunk. The trooper searched the trunk; finding nothing, the trooper released him without issuing a citation.

Approximately one month later, White was again traveling northbound on the Turnpike when he was stopped near interchange 9 by another unidentified white trooper for erratic driving. (amend.comp. ¶ 22) Like the first stop, the trooper checked White's license, registration and insurance information, before searching the trunk. Once again, the search revealed no evidence of criminality. White was released without being issued a citation.

### iii.) Hamiel

Hamiel alleges that in March 1999, he and his brother were traveling on the Turnpike when an unidentified white trooper stopped him in the vicinity of interchange 8. (amend.comp.¶ 24) As the trooper approached the vehicle, Hamiel inquired as to why he had been stopped. The trooper ignored this question, and ordered Hamiel and his brother to get out of the vehicle. Hamiel complied but asked the trooper if it was necessary for his brother to get out of the car because his leg was in a cast. Hamiel asserts that the trooper responded with vulgarities and again ordered both men to get out of the vehicle. The trooper ordered the two men against the car, frisked them, and then directed them to stand alongside the guardrail while he searched the vehicle. The search proved futile, and Hamiel was released without being issued a citation. This stop lasted approximately twenty-five minutes.

Hamiel was stopped again in December 1998, while traveling southbound on the Turnpike. This time Hamiel was detained for an unspecified period of time before he was released without being issued a citation. (amend.comp.¶ 25)

### iv.) Hamilton

Hamilton alleges that he was stopped on the morning of December 2, 1998, while driving southbound on the Turnpike in the vicinity of interchange 4. (amend.comp. ¶ 26) The unidentified trooper told Hamilton that he was stopped for speeding, however, the trooper released him without issuing a citation once learning that Hamilton is a Juvenile Detention Officer,. Sev-

eral minutes later, Hamilton was stopped again by a second trooper for speeding. This time, Hamilton was issued a ticket. After, the trooper returned to his vehicle, Hamilton approached him to ask about the calculation of the fine. (amend.comp.¶ 27) At this time, the trooper asked Hamilton why he had not identified himself as a Juvenile Detention Officer before he issued the ticket.

## III. DISCUSSION

### A. Legal Standard

"A complaint may be dismissed pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim where it appears beyond doubt no relief could be granted under any set of facts which could be proved consistent with the allegations." *In re Nice Systems, Ltd. Securities Litigation*, 135 F.Supp.2d 551, 564 (D.N.J.2001). In considering a Rule 12(b)(6) motion, the court will accept all of the allegations as set forth in the complaint as true, and draw any reasonable inferences in favor of the plaintiff. *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984); *Nami v. Fauver*, 82 F.3d 63, 65 (3d Cir. 1996). However, the court need not accept bald assertions or legal conclusions made in plaintiff's papers. *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997). A motion to dismiss does not resolve the ultimate question of liability in a matter; rather, its purpose it to determine whether the plaintiff will be entitled to move forward with discovery. *In re Burlington Coat Factory Securities Litig.*, 114 F.3d 1410, 1420 (3d Cir.1997). The Third Circuit has explained that "[t]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Id.* (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974)).

In general, a court may not consider any material beyond the pleadings, however, factual allegations contained in other documents referred to in the complaint and matters of public record may be referenced if the plaintiffs' claims are based upon those documents. *Burlington Coat Factory*, 114 F.3d at 1426. The Third Circuit has explained that "a court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document." *Pension Benefit Guar. Corp. v. White Consol. Ind. Inc.*, 998 F.2d 1192, 1195 (3d Cir. 1993).

### B. § 1983 Claim [3]

Currently before this Court are Pagano's and Verniero's motions for dismissal of Count One of plaintiffs' amended complaint, which seeks damages pursuant to 42 U.S.C. § 1983. Giving full credit to all of plaintiffs' allegations, the Court finds that plaintiffs have pled sufficient facts which if established at trial could result in Verniero's and Pagano's liability under Section 1983. Therefore the motions to dismiss Count one are denied.

"Section 1983 imposes civil liability upon any person, who acting under the color of state law, deprives another individual of any rights, privileges or immunities secured by the Constitution or laws of the United States." [4] *Doe v. Delie*, 257 F.3d

---

**3.** Col. Williams is also named as a defendant under Count I of the amended complaint.

**4.** 42 U.S.C. § 1983 provides in pertinent part: Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the

309, 314 (3d Cir.2001). Section 1983 does not create any new substantive rights, but rather, it provides a remedy for violations of rights conferred in the Constitution or other statutes. *Id.* (citing *Baker v. McCollan,* 443 U.S. 137, 144 n. 3, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979)).

For a Section 1983 claim to survive a motion to dismiss, the plaintiff must plead that: "(1) a person deprived him of a federal right; and (2) the person who deprived him of that right acted under the color of state or territorial law." *Groman v. Township of Manalapan,* 47 F.3d 628, 633 (3d Cir.1995)(citing *Gomez v. Toledo,* 446 U.S. 635, 640, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980)).

■ A governmental entity or an individual governmental official may be held liable under Section 1983. *Sample v. Diecks,* 885 F.2d 1099, 1118 (3d Cir.1989). However, for liability to attach to an individual defendant he or she must have been personally involved with the alleged constitutional violations. *Rode v. Dellarciprete,* 845 F.2d 1195, 1207 (3d Cir.1988). A defendant's "[p]ersonal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence." *Id.* However, allegations of participation or actual knowledge and acquiescence must be made with appropriate particularity. *Id.*

■ Plaintiffs have alleged in their amended complaint that they were victims of the selective enforcement of motor vehi- cle laws which violate their right to due process and equal protection under the Fourteenth Amendment.[5] *See* U.S. Const. amend. XIV. The plaintiffs have also alleged that defendants' violated their Fourth Amendment right to be free from unreasonable searches and seizures by searching their vehicles without probable cause.[6] *See* U.S. Const. amend. IV.

Relying upon the Third Circuit's holding in *Sample,* 885 F.2d at 1110, Verniero argues that he can not be held individually liable under Section 1983 "simply because he is aware of a problem and has 'ultimate authority' for resolving it." (Verniero brief at 9) However, plaintiffs allege Verniero and Pagano were intimately aware of racial profiling and acted with deliberate indifference towards resolving it. (amend. comp.¶ 35)

The Third Circuit has found that "deliberate indifference" is akin to a finding of "reckless indifference," "gross negligence," or "reckless disregard." *Williams v. Borough of West Chester,* 891 F.2d 458, 464 (3d Cir.1989); *See City of Canton v. Harris,* 489 U.S. 378, 389, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989) (holding that a police department's failure to train its police officers to provide injured detainees with proper medical treatment may result in a finding of deliberate indifference); *Davis v. Monroe Cty. Bd. of Educ.,* 526 U.S. 629, 650, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999)(holding that public school administrators who have knowledge of male stu-

---

Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

5. For a selective prosecution claim to survive a motion to dismiss, a defendant must allege that (1) similarly situated suspects of a different race violated the law and were not prosecuted; and (2) the prosecutor's decision to prosecute was based at least partially upon race. *United States v. Armstrong,* 517 U.S. 456, 465, 116 S.Ct. 1480, 134 L.Ed.2d 687 (1996). The same standard should apply to selective enforcement claims.

6. Before searching an automobile, a law enforcement officer must have probable cause to believe that the search will result in the discovery of contraband or other evidence that a crime has been committed. *United States v. McGlory,* 968 F.2d 309, 343 (3d Cir.1992).

dents bullying female students to prevent them from using school athletic fields, but fail to remedy the problem may result in a finding of deliberate indifference).

Plaintiffs allege that during Col. Pagano's tenure as Superintendent, he advocated the use of racial profiling. To this end, plaintiffs have directed the court's attention to certain comments that Pagano made in response to the airing of WWOR Television's special report "Without Just Cause," to the formation of the Drug Interdiction Training Unit in 1987, which allegedly taught trainees to profile in order to effectuate drug arrests, and to the fact that minorities were stopped more frequently than whites. *See Soto,* supra; (amend.comp.¶ 34).

As to Verniero, plaintiffs have alleged that he concealed the existence of racial profiling until April 1999, despite learning of its existence shortly after he became the Attorney General. Plaintiffs assert that Verniero concealed this information from the Appellate Division in the *Soto* appeal (amend.comp.¶ 34), and from the DOJ after it began its profiling investigation in 1997. Plaintiffs have alleged that Verniero's inaction allowed racial profiling to continue, when he should have used his knowledge and authority to rectify the problem. (amend.comp.¶ 35)

Plaintiffs have therefore alleged a set of facts which could form the basis of a claim under Section 1983, and, therefore, Pagano's and Verniero's motions for dismissal of Count one are denied.

## C. § 1981 Claim [7]

Also before this Court is Verniero's motion for dismissal of Count two of plaintiffs' amended complaint, which asserts that he violated plaintiffs' right to equal treatment under the law in violation of 42 U.S.C. § 1981.

■ "Section 1981 prohibits 'racial' discrimination in the making of private and public contracts." *Pamintuan v. Nanticoke Memorial Hosp.,* 192 F.3d 378, 385 (3d Cir.1999)(citing *St. Francis College v. Al–Khazraji,* 481 U.S. 604, 609, 107 S.Ct. 2022, 95 L.Ed.2d 582 (1987)). This Section "prohibits · discrimination that infects the legal process in ways that prevent one from enforcing contract rights, by reason of his or her race." [8] *Mian v. Donaldson, Lufkin & Jenrette Securities Corp.,* 7 F.3d 1085, 1086 (2d Cir.1993)(citing *Patterson v. McLean Credit Union,* 491 U.S. 164, 177, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989)).

Although Section 1981 is a federal civil rights statute it is more appropriately analyzed in terms of a tort remedy. *Al–Khazraji v. St. Francis College,* 784 F.2d 505, 517 (3d Cir.1986). Section 1981 is not a general civil rights statute, nor is it intended as a redundancy of Section 1983, rather, it "embraces protection of a legal process, and of a right of access to legal process, that will address and resolve contract-law claims without regard to race. In this respect, it prohibits discrimination that infects the legal process in ways that prevent one from enforcing contract

---

7. Williams and Pagano are also named as defendants under Count II. The claim against Pagano was dismissed with the consent of the parties on November 14, 2001. Williams has not filed a motion to dismiss.

8. 42 U.S.C. § 1981(a) provides:
   All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

rights, by reason of his or her race." *Mian,* 7 F.3d at 1086.

■ Section 1981 plaintiffs are required to allege a *prima facie* case of discrimination by showing that: (1) the plaintiff is a racial minority; (2) the defendant discriminated against plaintiff; (3) the defendant had an intent to discriminate on the basis of race; and (4) the discrimination concerned one or more of the activities enumerated in the statute. *Williams v. Penn. State Police Bureau of Liquor Control,* 108 F.Supp.2d 460, 472 (E.D.Pa.2000); *see McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

■ The Amended Complaint sufficiently alleges that plaintiffs are racial minorities, and that they suffered racial discrimination. However, plaintiffs have not alleged that the defendant's actions violated any of their specifically enumerated rights in the statute. *See Santiago v. City of Vineland,* 107 F.Supp.2d 512, 532 (D.N.J.2000)(citing *Morris v. Office Max, Inc.,* 89 F.3d 411, 413 (7th Cir.1996)). The plaintiffs have alleged that the defendants have violated their right to be secure from unreasonable search and seizure, and to be protected from selective prosecution. Although these allegations properly invoke a remedy under Section 1983, they do not embrace the intent or language of Section 1981. As a result, the Court declines to expand the scope of Section 1981 to remedy discriminatory conduct already protected under Section 1983.

■ The only reference to Verniero's discriminatory intent in the Amended Complaint is the following conclusory statement: "the acts of the defendants were motivated by racial animus and by their desire to injure, oppress, and intimidate plaintiffs because of their race." (amend.comp.¶ 51) No facts are alleged which support that allegation, or that Verniero had any intent to deprive plaintiffs (or anyone)of the enumerated rights contained in the statutory language. Since, "[c]onclusory allegations of generalized racial bias do not establish discriminatory intent," plaintiffs have not alleged that Verniero acted with racial animus. *Jones v. School Dist. of Philadelphia,* 19 F.Supp.2d 414, 421 (E.D.Pa.1998), *aff'd,* 198 F.3d 403 (3d Cir.1999)(citing *Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.,* 429 U.S. 252, 264–68, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977)).

Verniero's motion to dismiss Count two is granted.

### D. §§ 1985 [9] and 1986 [10] Claims

Also before this Court is Verniero's motion for dismissal of Counts three and four of plaintiffs' amended complaint. Count three alleges that Verniero, along with Williams, Pagano and other unnamed defendants conspired "to violate the civil rights of plaintiffs based on their race" in violation of 42 U.S.C. § 1985. (amend. comp.¶ 54) Count Four alleges that Verniero "had knowledge of the discrimination and other violations of constitutional rights perpetrated on minorities, including plain-

9. Cols. Williams and Pagano are also named as defendants under Count III. The claim against Col. Pagano was dismissed with the consent of the parties on November 14, 2001. Col. Williams has not filed a motion to dismiss.

10. Cols. Williams and Pagano, the Turnpike Authority and the State Police are also named as defendants under Count IV. The claims against Col. Pagano and the State Police was dismissed with the consent of the parties on November 14, 2001. Col. Williams and the Turnpike Authority have not filed motions to dismiss this claim.

tiffs, by their subordinates, but neglected and failed to prevent" those acts from occurring even though he had the power to do so in violation of 42 U.S.C. § 1986. (amend.comp.¶ 57) The court denies Verniero's motion to dismiss these counts since plaintiffs have alleged that Verniero entered into a conspiracy to conceal racial profiling from the judiciary and the DOJ, and that he negligently failed to prevent his subordinates from depriving plaintiffs of their civil rights.

■ Section 1985 does not create any substantive rights by itself, rather, it is used to vindicate federal rights and privileges that are enumerated in the Constitution or in other federal statutes. *Great Am. Fed. Sav. & Loan Ass'n v. Novotny*, 442 U.S. 366, 376, 99 S.Ct. 2345, 60 L.Ed.2d 957 (1979). "In general, the conspiracy provision of § 1985(3) provides a cause of action under rather limited circumstances against both private and state actors." *Brown v. Philip Morris, Inc.*, 250 F.3d 789, 805 (3d Cir.2001).

■ For a Section 1985 claim to survive a motion to dismiss a plaintiff must allege: "(1) a conspiracy; (2) motivated by a racial or class based discriminatory animus designed to deprive, directly or indirectly, any person or class of persons to the equal protection of the laws; (3) an act in furtherance of the conspiracy; and (4) an injury to person or property or the deprivation of any right or privilege of a

citizen of the United States." [11] *Lake v. Arnold*, 112 F.3d 682, 685 (3d Cir.1997)(citing *Griffin v. Breckenridge*, 403 U.S. 88, 91, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971)). The Third Circuit has explained that a Section 1985(3) plaintiff must establish: "(a) that a racial or other class-based invidious discriminatory animus lay behind the coconspirators' actions, (b) that the coconspirators intended to deprive the victim of a right guaranteed by the Constitution against private impairment, and (c) that the right was consciously targeted and not just incidentally affected." *Brown*, 250 F.3d at 805 (quoting *Spencer v. Casavilla*, 44 F.3d 74, 77 (2d Cir.1994)). By contrast, racial animus is not a required element in a Section 1983 claim, nor does it require intentional conduct or any other particular state of mind as a prerequisite to recovery. *Goodman v. Lukens Steel Co.*, 777 F.2d 113, 135 (3d Cir.1985).

■ Section 1986 is a companion to Section 1985(3) and provides a cause of action against persons who, knowing that a violation of § 1985(3) is about to be committed and possessing the power to prevent its occurrence, fail to take action to frustrate its execution. *Rogin v. Bensalem Tp.*, 616 F.2d 680, 696 (3d Cir.1980), *cert. denied*, 450 U.S. 1029, 101 S.Ct. 1737, 68 L.Ed.2d 223 (1981). "[T]ransgressions of § 1986 by definition depend on a preexisting violation of § 1985." *Clark v. Clabaugh*, 20 F.3d 1290, 1295 (3d Cir.1994).

11. 42 U.S.C. § 1985(3) provides in pertinent part:

    If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all

persons within such State or Territory the equal protection of the laws ..., or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

■ In addition to establishing the existence of a Section 1985 conspiracy, a plaintiff asserting a claim under Section 1986 must demonstrate that: "(1) the defendant had actual knowledge of a § 1985 conspiracy, (2) the defendant had the power to prevent or aid in preventing the commission of a § 1985 violation, (3) the defendant neglected or refused to prevent a § 1985 conspiracy, and (4) a wrongful act was committed." [12] *Id.*

■ Plaintiffs have alleged that Verniero conspired with members of the Attorney General's office staff to conceal the existence of racial profiling from the judiciary and the DOJ. (amend.comp.¶ 35) Plaintiffs have added that this concealment led to the deprivation of their civil rights by causing them to become victims of the State Police's selective enforcement of traffic law and searches of their vehicles without probable cause.

As to the Section 1986 claim, plaintiffs have alleged that when Verniero was the Attorney General he had the ultimate authority over the State Police, and the Attorney General's office. Further, plaintiffs have alleged that for much of his tenure as Attorney General, Verniero had actual knowledge of various racially motivated conspiracies within the State Police, and that he had the power to stop the conspirators from committing discriminatory acts. Plaintiffs allege that despite his knowledge

and power, Verniero did nothing to stop the discrimination. Therefore, plaintiffs have stated a valid claim under Section 1986.

Mindful of the standards that the Court must observe in considering motions to dismiss under Rule 12(b)(6), *see, infra,* the Court concludes that plaintiffs have alleged colorable claims against Verniero under Section 1985 and Section 1986. Plaintiffs should have the opportunity to come forward with evidence to develop these claims.

Verniero's motion to dismiss counts three and four is denied.

### E. § 2000d Injunctive Relief Claims [13]

Currently before this Court are motions for dismissal or, in the alternative, for summary judgment of Count Five of plaintiffs' Amended Complaint which seeks injunctive relief pursuant to 42 U.S.C. § 2000d (Title VI). Because the desired relief duplicates the relief granted in the consent decree in *United States v. State of New Jersey,* No. 99–5970, which is currently under the supervision of Judge Cooper, the Court grants defendants' motion, in the interest of comity and judicial economy, and dismisses Count five in its entirety.

■ Private individuals may sue to enforce Title VI and obtain both injunctive

---

12. 42 U.S.C. § 1986 provides in pertinent part:

Every person, who having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do, if such wrongful act be committed, shall e liable to the party injured, or his legal representatives, for all damages caused by such wrongful act, which such person by reasonable diligence could have

been prevented; and such damages may be recovered in an action on the case; and any number of persons guilty of such wrongful neglect or refusal may be joined as defendants in the action[.]

13. Count V of the amended complaint does not specify which defendants are named under Count Five, and, therefore, the court deems the count to include all defendants including: Williams, the State Police, Verniero, Farmer, Pagano, Fedorko and the Turnpike Authority.

relief and damages.[14] *Alexander v. Choate,* 469 U.S. 287, 293, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985). However, Title VI itself only reaches instances of intentional discrimination. *Alexander v. Sandoval,* 531 U.S. 1049, 121 S.Ct. 652, 148 L.Ed.2d 556 (2000). Therefore, if a plaintiffs' discrimination claim relies upon disparate impact analysis, they cannot recover damages or seek an injunction under Title VI. *Id.* In this case, plaintiffs seek injunctive relief to remedy alleged intentional discrimination, therefore, the claim is properly asserted.

■ However, it is within this Court's discretion to dismiss a claim that is duplicative of another in a different federal court. *Remington Rand Corp.-Delaware v. Business Systems Inc.,* 830 F.2d 1274, 1275–76 (3d Cir.1987); *see Colorado River Water Conservation Dist. v. United States,* 424 U.S. 800, 817, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976)("As between federal district courts, . . . though no precise rule has evolved, the general principle is to avoid duplicative litigation"). "It long has been recognized that there is a 'power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants.'" *Remington Rand Corp.-Delaware v. Business Systems Inc.,* 830 F.2d 1274, 1275–76 (3d Cir.1987)(quoting *Landis v. North Am. Co.,* 299 U.S. 248, 254, 57 S.Ct. 163, 81 L.Ed. 153 (1936)).

The purpose of the rule is to conserve judicial resources, avoid piecemeal litigation, eliminate the risk of inconsistent adjudications, and "to promote comity among federal courts of equal rank." *E.E.O.C. v. University of Pennsylvania,* 850 F.2d 969, 971–72 (3d Cir.1988), *aff'd,* 493 U.S. 182, 110 S.Ct. 577, 107 L.Ed.2d 571 (1990). Sixty years ago, the Third Circuit warned against duplicative litigation and pointed out its pitfalls. *Crosley Corp. v. Hazeltine Corp.,* 122 F.2d 925, 929 (3d Cir.1941), *cert. denied,* 315 U.S. 813, 62 S.Ct. 798, 86 L.Ed. 1211 (1942). The court explained:

> The economic waste involved in duplicating litigation is obvious. Equally important is its adverse effect upon the prompt and efficient administration of justice. In view of the constant increase in judicial business in the federal courts and the continual necessity of adding to the number of judges, at the expense of the taxpayers, public policy requires us to seek actively to avoid the waste of judicial time and energy. Courts already heavily burdened with litigation with which they must of necessity deal should therefore not be called upon to duplicate each other's work in cases involving the same issue and the same parties.

*Id.* at 929–30. The Second Circuit has cautioned that "[t]he complex problems that can arise from multiple federal filings do not lend themselves to a rigid test, but require instead that the district court consider the equities of the situation when exercising its discretion." *Curtis v. Citibank, N.A.,* 226 F.3d 133, 138 (2d Cir. 2000).

■ The plaintiffs' claims are nearly identical to those embraced by the Consent Decree. *See United States v. New Jersey,* No. 99–5970. In fact, the Consent Decree provides for more extensive relief than is currently sought in this action. The Consent Decree prohibits troopers

---

14. 42 U.S.C. § 2000d provides:
   No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

from considering race when enforcing the State's laws in any manner. At its core, the Consent Decree requires the State to develop and implement a computerized "Management Awareness Program" designed to "identify and modify potentially problematic behavior" and to "promote best practices" among troopers, thereby allowing the State to gather statistics concerning racial profiling and be proactive in its training and discipline to ensure that racial profiling is eradicated. The Consent Decree also requires the State to set up a civilian complaint commission to properly gather, investigate, and resolve any civilian profiling complaints. It also provides for the State to implement new training at the academy for trainees and troopers alike to help educate the force about the illegalities of racial profiling and alternative methods of policing. Finally, the Consent Decree provides for the appointment of an independent monitor to oversee the implementation of these new programs and to keep the court abreast of any new developments. Therefore, if the State fails to comply with the provisions of the Consent Decree, the Justice Department will file an appropriate action before Judge Cooper to see that it is enforced.

Plaintiffs argue that the Consent Decree is an inadequate injunctive remedy, and, therefore, further restraints are necessary. However, this concern does not require this Court to enter restraints upon the defendants. Rather, parties, such as the plaintiffs in this claim, who claim to be aggrieved by the State Police can move to intervene in the matter before Judge Cooper if there are additional forms of injunctive relief that they deem necessary to address the problem.

Plaintiffs also complain that the Consent Decree is inadequate because it enjoins only the State, not the individual defendants or the Turnpike Authority, from further discrimination. This argument is without merit as the Consent Decree is binding upon the State, its subdivisions, and individual employees.

Since the relief sought in Count five is duplicative of the injunctive relief already provided in the Consent Decree, the Court concludes in the interest of comity, judicial economy, and to provide for the fair and efficient administration of justice that Count Five of the amended complaint is dismissed as to all parties.

## IV. CONCLUSION

For the reasons set forth above, this Court denies Verniero's motion to dismiss Counts one (§ 1983). The Court also denies Pagano's motion to dismiss Count one, three and four (§§ 1983, 1985, 1986). The Court grants Verniero's motion to dismiss Counts two (§ 1981). The Court grants defendants' motion to dismiss Count five (§ 2000d) in the interest of comity and judicial economy because the relief sought is duplicative of the Consent Decree. An appropriate order is attached.

### ORDER

For the reasons set forth in the Court's decision dated January 9, 2002, **IT IS ORDERED** that (1) defendants' motion to dismiss Counts one, three and four is denied; (2) defendant Verniero's motion to dismiss count two is granted; (3) defendants' motion to dismiss Count five is granted. Count Five is dismissed as to all parties with prejudice.

**IT IS ORDERED** that this action shall proceed as to the following counts: Count one (§ 1983) as to defendants Williams, Pagano and Verniero; Count two (§ 1981) as to Williams; Count three (§ 1985) as to Williams and Verniero; Count four (§ 1986) as to Williams, Verniero and the Turnpike Authority.

**IT IS ORDERED** that all claims as to defendants Farmer, Fedorko, and Department of Law and Public Safety—Division of State Police have been or are dismissed.

**IT IS ORDERED** that all claims asserted by plaintiff South Burlington County Branch, National Association for the Advancement of Colored People have been or are dismissed.