774 A.2d 693 (2001)
340 N.J. Super. 492
STATE of New Jersey, Plaintiff-Respondent,
v.
Jerish HALSEY, also known as Jabril A. Johnson, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued January 9, 2001.
Decided June 1, 2001.
*694 James P. Madden, Designated Counsel, argued the cause for appellant (Peter A. Garcia, Acting Public Defender, attorney).
Annmarie Cozzi, Assistant Prosecutor, argued the cause for respondent (William H. Schmidt, Bergen County Prosecutor, attorney).
Before Judges STERN, A.A. RODRIGUEZ and FALL.
The opinion of the court was delivered by RODRIGUEZ, A.A., J.A.D.
In this appeal, we hold that a motorist, stopped by a police agency other than the State Police, cannot rely on the contents of the Attorney General's Interim Report[1] to show entitlement to discovery in order to explore the existence of a racial profiling or selective enforcement defense.[2]

I
Defendant, Jerish Halsey, also known as Jabril Johnson, along with co-defendants Gregory N. Robinson and Jerry L. Candia, were arrested for possession of cocaine and related charges stemming from a motor vehicle stop on the George Washington Bridge. After an indictment was returned, defendant and Candia moved to suppress evidence of the cocaine, which was seized after a warrantless search.
Judge Elijah Miller heard the following evidence at the hearing on the motion to suppress. On October 4, 1996, at approximately 2:15 p.m., Port Authority Officer Gregory Johnson was driving westbound in a marked police unit on the George Washington Bridge. Port Authority Police Officers Tromlin and Simons were his passengers. While driving on the bridge's upper level, Johnson saw a gold Infiniti with a Connecticut paper dealer's plate "driving in a careless manner." The Infiniti was weaving in its lane, riding the lane markings, and at one point, was tailgating the vehicle in front. Johnson estimated that the Infiniti was traveling approximately two miles over the speed limit. He noticed that the Infiniti's driver was "either black or Puerto Rican."
Officer Johnson stopped the Infiniti after it exited the bridge. Officers Johnson, Tromlin and Simons then exited the patrol vehicle and approached the Infiniti. The driver, Robinson, could not produce a driver's license or registration. He explained that he had recently purchased the vehicle and that the registration sticker was on the window. He admitted that he had no license, insurance, nor any identification.
*695 Johnson asked Robinson to exit the vehicle. While standing at the rear of the vehicle, Robinson told Johnson that the Infiniti belonged to his cousin's girlfriend. He and the rear seat passenger, Candia, had driven to Manhattan from Linden to buy rims for the car's tires.
Johnson noticed that Robinson was nervous when he exited the vehicle. He was also swaying while walking and standing, used profanity, acted boisterously, and uttered incomplete thoughts. Johnson suspected that Robinson was under the influence of CDS. He checked Robinson's eyes with a small pen light and noticed that his pupils were dilated and sluggish in reaction to the light.
Defendant was the front seat passenger. Johnson asked defendant to exit the vehicle because he did not want to talk to him in front of Candia, the rear seat passenger. At the front end of the Infiniti, defendant said that the car belonged to his sister, Tammy Halsey. Defendant said that he and Candia were in New York and happened to meet the driver there. Johnson noted that when defendant exited the vehicle, he was swaying, his eyes were watery and bloodshot, he was using profanity and talking fast. Johnson checked his eyes with his flashlight, and observed that his pupils were dilated and sluggish in reaction to the light. Johnson also noted that defendant's clothes were dirty and mussed. Johnson told defendant to stay at the front of the Infiniti, then walked to the side to speak to Candia.
Johnson looked into the car to speak to the rear seat passenger and observed a brown paper bag by his foot. Johnson asked Candia who owned the car and where they were coming from. Candia responded that the three of them were in New York visiting a friend. Johnson observed that Candia was using profanity and his pupils were fixed with no reaction to light.
Officer Tromlin retrieved the brown paper bag. The bag contained crack vials and plastic crack caps for the vials.
Johnson arrested the three occupants of the Infiniti. When asked if the suspects were placed under arrest at this point, Johnson testified:
They were under arrest before. They didn't know it but they were under arrest, but yes, after that, they all denied knowledge or ownership of the bag and its contents and then they were physically handcuffed.
In other words, the suspects were already under arrest for being under the influence of drugs but Johnson had not actually told them this until the brown paper bag was opened. The three men were placed in the back of the police car and driven to headquarters. Officer Tromlin sat in the front seat and Officer Simons drove the Infiniti. As they were driving back, Tromlin tapped Johnson on the leg and whispered to him that Candia was moving around a lot in the back seat. When the officers arrived at headquarters, they took Candia out of the squad car. Johnson pulled out the back seat of the squad car and found a plastic bag with crack cocaine.
In denying defendant's and Candia's motion to suppress, Judge Miller found:
[Officer Johnson] activated his lights, hit his siren, used his PA system, pulled over the vehicle to the right, it pulled over without incident, he made no untoward observations. On cross-examination noted that the driver was either a black male or ... a Puerto Rican male, he indicated, but he did not stop him because of race, it was not a profile stop, I'll get into that a little bit more, but that seems to be indicated.

*696 I note, parenthetically, Officer Johnson is an African American and testifying in this context.
....
Here, Officer Johnson stopped the defendant's vehicle based on a reasonable and articulable suspicion that the motor vehicle violation had occurred. Robinson was driving in an erratic and careless manner, he was weaving in traffic and I so find, on the marking lanes as well as tailgating very close to the vehicle, within 15 feet....
....
A look at the facts of this case clearly show that the officer's observation gave him a qualified suspicion, if not probable cause, and I so find it was probable cause, that a motor vehicle infraction occurred, therefore, the stop of the defendant's car was lawful.
....
The officer observed all three men to be under the influence, and failed to produce any identification. Clearly, the car could not go anywhere, could not be driven, it would have to be impounded as the officer said at that point. Based on these observations, Officer Johnson lawfully arrested all three men. Subsequently, they were read their rights, placed under arrest, handcuffed, placed in the rear of the car. He acted appropriately, I found [him] to be candid, I find nothing in his conversation, in his testimony to indicate anything other than being candid.
....
I do find in this case they had that probable cause, based not only on the weaving and driving of that vehicle, but the perception that they were under the influence of drugs at that time, all three individuals, at this point.
After the motion to suppress was denied by Judge Miller, defendant entered into a negotiated plea of guilty to second degree possession of cocaine with intent to distribute, N.J.S.A. 2C:35-5a(1), and -5b(2). In exchange, the State agreed to dismiss a related charge of third degree possession of cocaine, N.J.S.A. 2C:35-10a(1), and two disorderly persons charges: being under the influence of CDS, N.J.S.A. 2C:35-10b, and possession of drug paraphernalia, N.J.S.A. 2C:36-2 (Fort Lee Municipal Court complaint # S927819), and to recommend a ten-year term of imprisonment with a fifty-seven month period of parole ineligibility. Judge Eugene H. Austin accepted the plea and imposed the negotiated sentence.

II
Defendant now appeals pursuant to R. 3:5-7(d) contending that:
THE TRIAL COURT ERRED IN DENYING THE DEFENDANT'S MOTION TO SUPPRESS.
A. The Police Lacked The Requisite Articulable Suspicion In Order To Justify The Initial Motor Vehicle Stop Of The Vehicle Defendant Was Riding In.
B. Defense Counsel Should Have Been Allowed To Pursue The Line Of Questioning Regarding Racial Profiling And It Was Reversible Error For The Judge To Limit Defense Counsel's Questioning Regarding That Issue.
C. The Police Officer's Ordering The Defendant To Get Out Of The Vehicle Constituted A Violation Of His Fourth Amendment Rights.
D. The Testimony Of Officer Johnson Did Not Demonstrate That He Had Probable Cause To Arrest The Occupants Of The Vehicle For Being Under The Influence Of A Controlled *697 Dangerous Substance, And Therefore The Search Of The Vehicle Violated The Defendant's Fourth Amendment Rights.
E. The Search Of The Vehicle Was Not Conducted Incident To a Lawful Custodial Arrest, And Therefore The Officer's Action In Searching The Vehicle Violated The Defendant's Fourth Amendment Rights.
F. The State Cannot Rely Upon The Claim That The Evidence Would Have Been Inevitably Discovered After An Inventory Search.
We are not persuaded by any of these arguments which are without merit and, with one exception (the racial profiling issue), do not require extensive discussion in a written opinion. R. 2:11-3(e)(2). We merely note the following. Judge Miller found Officer Johnson to be a credible witness. Johnson's testimony about the Infiniti's speed, tailgating, and changing lanes justified the stop for careless driving. That Officer Johnson did not prove a motor vehicle violation at the motion to suppress does not negate a good faith stop based upon an articulable and reasonable suspicion that a motor vehicle violation occurred. Asking defendant to exit the Infiniti was appropriate and does not require reversal under the "objectively reasonable" test of State v. Smith, 134 N.J. 599, 618-19, 637 A.2d 158 (1994) (holding that "the officer need point only to some fact or facts in the totality of the circumstances that would create in a police officer a heightened awareness of danger that would warrant an objectively reasonable officer in securing the scene in a more effective manner by ordering the passenger to alight from the car"). Having legitimately asked the driver to exit the Infiniti, and believing that the driver was under the influence, Johnson was justified in making further inquiry of the other occupants who were likely to drive the Infiniti from the scene. In State v. Pierce, 136 N.J. 184, 208, 642 A.2d 947 (1994), the Supreme Court held that a search of a vehicle is not authorized incident to an arrest for a motor vehicle offense. However, an arrest for being under the influence is different than a simple motor vehicle violation, such as driving while a license is suspended as in Pierce. In the latter case, the vehicle can be driven from the area of the stop after a summons has been issued. In the former, the stopped vehicle may have to be impounded if there is no alternative driver available and fit to drive.

III
Defendant contends that Judge Miller erred by not allowing defense counsel to pursue the line of questioning regarding racial profiling. We disagree. The argument is based on the following exchange.
[CO DEFENDANT CANDIA'S COUNSEL]: Officer Johnson, how many drug stops have you ever made on the George Washington Bridge?
[JOHNSON]: Thousands and thousands and thousands.
Q. And, in your training, are you trained to spot maybe suspicious vehicles?
A. Spotthere's certain drug interdiction courses that go into certainyeah, I would say yeah.
Q. Isn't it a fact that they train you to spot out of state vehicles as, perhaps, indicative of transporting drugs and drug paraphernalia, is that one of the factors, that's my question.
A. That by itself, no.
Q. Is that one factor?
A. One factor? In a combination. We have to have a combination, maybe out of state, luggage in the back seat, or a spare tire in the back seat, it's a rental, *698 there's combinations, no just out of state plate, no.
Q. Would you consider the race of the occupant in determining whether or not to pull over a car?
A. I wouldn't, no I wouldn't.
Q. Wouldis [i]t common practice of the Fort Lee Police Department to pull over black men on the George Washington Bridge, driving an out of state.
THE COURT: How is that relevant? We havethe officer has indicated that it's not his policy, he made the stop. Practice notwithstanding
[PROSECUTOR]: He's also not a Fort Lee police officer.
THE COURT: And he's not Fort Lee. We're dealing with ... Port Authority police officers and we do it in both states, so per force, anyone coming across is going to be out of state, one[ ] state or the other. So, and he's indicated right now at this point, that is not his policy. So the policy of any other police officer, even Port Authority to go to that point in time, he didn't say that had any bearing on hisyou want to rephrase and start again?
....
Q. Could you describe to the Court and to myself, the various factors that would constitute a profile for ... a vehicle containing drugs?
A. I don't know of a profile. You know, you get old people, you get young people. I know of no profile.
Q. But in the thousands of vehicles that you pulled over, have you found a common profile?
[PROSECUTOR]: Objection as to relevance in this case, Judge.
THE COURT: Well, it would seem to be stretching. You may get there eventually, but at this point I'm sustaining the objection. You rephrase and try to get there another way.
....
Q. After you pulled over the individuals, or prior to pulling over the individuals, at what point did you notice the race of the individuals in the vehicle?
A. When I was pacing them.
Q. You noticed
A. Not all of them, I could see the head of the driver.
Q. And, what race did you believe the driver to be?
A. Could either be black or Puerto Rican, I guess, from his look.
On appeal, defendant argues that this ruling was in error.
We begin our analysis with a review of controlling principles. A defense claim of selective prosecution based on racial or ethnic profiling is a challenge to the constitutionality of the prosecution itself. United States v. Armstrong, 517 U.S. 456, 463, 116 S.Ct. 1480, 1486, 134 L.Ed.2d 687, 698 (1996). However, the burden to establish such a claim "is a demanding one." Ibid. The movant must demonstrate that the criminal laws were "directed so exclusively against a particular class" so as to amount to a "practical denial" of equal protection under the law. Id. at 464-65, 116 S.Ct. at 1486, 134 L.Ed.2d at 698 (quoting Yick Wo v. Hopkins, 118 U.S. 356, 373, 6 S.Ct. 1064, 1073, 30 L.Ed. 220, 227 (1886)). The party asserting such a claim must show that similarly situated individuals of a different class were not prosecuted for similar crimes. Id. at 465, 116 S.Ct. at 1487, 134 L.Ed.2d at 699. See also State v. Perry, 124 N.J. 128, 166-68, 590 A.2d 624, (1991); State v. Di Frisco, 118 N.J. 253, 266, 571 A.2d 914 (1990) (noting that the burden of proving selective enforcement is "heavy"; defendant must prove "intentional selectivity" and "an unjustifiable basis *699 for the discrimination"), cert. denied, 516 U.S. 1129, 116 S.Ct. 949, 133 L.Ed.2d 873 (1996).
In most instances, a claim of selective enforcement cannot be proven without discovery of police records, which show enforcement patterns during a period of time in a given geographical location. These records are usually within the exclusive control of the police agency. However, in order to obtain such discovery, a defendant must first make a showing of "a colorable basis for a claim of selective enforcement." State v. Kennedy, 247 N.J.Super. 21, 25, 588 A.2d 834 (App.Div. 1991). In other words, "a defendant must present `some evidence tending to show the existence of the essential elements of the defense and that the documents in the government's possession would indeed be probative of these elements.'" Id. at 32, 588 A.2d 834 (quoting United States v. Berrios, 501 F.2d 1207, 1211-12 (2d Cir. 1974)). Such discovery "is permitted only when there is a colorable claim that a police agency has an officially sanctioned or de facto policy of selective enforcement against minorities." State v. Smith, 306 N.J.Super. 370, 378, 703 A.2d 954 (App. Div.1997).
On April 20, 1999, the Attorney General released and published the Interim Report. Subsequently, we held in State v. Ballard, 331 N.J.Super. 529, 542, 752 A.2d 735 (App.Div.2000), that several defendants who were members of racial or ethnic minorities and arrested after a motor vehicle stop on the New Jersey Turnpike by New Jersey State troopers, had satisfied the threshold necessary for purposes of obtaining discovery. We concluded that the threshold had been satisfied through the combined weight of the decision of the Law Division in State v. Soto, 324 N.J.Super. 66, 734 A.2d 350 (Law Div.1996) (granting defendants' motion to suppress where they proved a de facto policy in the State Police of "targeting blacks for investigation and arrest between April 1988 and May 1991" within a particular stretch of the New Jersey Turnpike), the Interim Report, and the lack of any presentation of facts that indicated a change in the policy or practice of the State Police between the Soto decision and the publication of the Interim Report. Ballard, supra, 331 N.J.Super. at 542-43, 752 A.2d 735.
Recently, we decided three cases dealing with the preservation for appeal of racial profiling claims. See State v. Ross, 335 N.J.Super. 536, 763 A.2d 281 (App.Div. 2000); State v. Williamson, 335 N.J.Super. 544, 763 A.2d 285 (App.Div.2000); State v. Velez, 335 N.J.Super. 552, 763 A.2d 290 (App.Div.2000). These three cases involved motor vehicle stops on roads patrolled by the State Police. In the three cases, after we found that the discovery thresholds had been met, we remanded, first to Judge Barisonek, the specially designated judge, to set the scope of discovery, and then to the respective trial courts for a reconsideration of the previously denied motions to suppress. Ross, supra, 335 N.J.Super. at 538, 763 A.2d 281; Williamson, supra, 335 N.J.Super. at 551, 763 A.2d 285; Velez, supra, 335 N.J.Super. at 560, 763 A.2d 290.
Subsequently, we held in State v. Glenford Francis, 341 N.J.Super. 67, 85, 775 A.2d 79 (App.Div.2001), that where judgment of conviction was entered following a trial, before publication of the Interim Report, the defendant was entitled to discovery regarding claims of racial profiling asserted on direct appeal. Francis involved a State Police motor vehicle stop. No motion to suppress had been filed. Defendant contended on direct appeal that trial counsel was ineffective for not pursuing a *700 motion to suppress and/or not raising a selective enforcement defense.
From Ross, Williamson, Velez, and Francis, it is clear that the Interim Report goes a long way towards meeting the discovery threshold in racial profiling claims. In Ballard, supra, we observed that the Interim Report acknowledges that the State Police had adopted uniform practices, procedures, and educational instructions which could encourage racial profiling. 331 N.J.Super. at 546-48, 752 A.2d 735. These practices and procedures potentially impact all motor vehicle stops effected by the State Police. Id. at 547, 752 A.2d 735. There is no similar acknowledgment with respect to other policy agencies.
This case does not arise from a motor vehicle stop by the State Police. It involves a stop by the Port Authority Police. The Interim Report, therefore, is not admissible to determine if the discovery threshold has been met.
We emphasize that the discovery threshold is the same in all cases regardless of the police agency involved. However, in cases involving the State Police, the courts may take judicial notice of the contents of the Interim Report. In cases involving other police agencies, the courts may not.
[Section IV of this opinion involving a sentencing issue has been redacted for publication purposes.]
Affirmed.
NOTES
[1] Interim Report of the State Police Review Team Regarding Allegations of Racial Profiling, released and published on April 20, 1999 by the Attorney General.
[2] This appeal has been assigned to this Part pursuant to its designation to consider and resolve questions pertaining to racial profiling or selective enforcement. See State v. Ballard, 331 N.J.Super. 529, 534, 752 A.2d 735 (App.Div.2000).