**Thomas M. WHITE, John McKenzie, Frederick Hamiel, Tyrone Hamilton, and South Burlington County Branch, National Association for the Advancement of Colored People, Plaintiffs,**

v.

**Col. Carl A. WILLIAMS, individually, Department of Law and Public Safety–Division of State Police, Peter Verniero, individually, John J. Farmer, Jr., in his official capacity as Attorney General of the State of New Jersey, Col. Clinton Pagano, individually, Col. Michael Fedorko, in his official capacity as Acting Superintendent of the New Jersey State Police, New Jersey Turnpike Authority,**

John and Jane Does 1–99, individually and in their official capacities, John and Jane Roes 1–99, individually and in their official capacities, and John and Jane Moes 1–99, individually and in their official capacities, Defendants.

No. CIV.A. 99–CV–2240(JAP).

United States District Court, D. New Jersey.

June 10, 2002.

William H. Buckman, Moorestown, NJ, for Plaintiffs.

Stefan Presser, ACLU Foundation of Pennsylvania, Philadelphia, PA, Justin T. Loughry, Loughry and Lindsay, Moorestown, NJ, Alan L. Yatvin, Howard D. Popper, Popper & Yatvin, Philadelphia, PA, David Rudovsky, Kairys, Rudovsky, Epstein, Messing & Rau, Philadelphia, PA, Seth F. Kreimer, Philadelphia, PA, for Thomas White and John McKenzie.

Michael R. Cole, Benjamin Clarke, R. Brian McLaughlin, Rupal Dalal, DeCotiis, Fitzpatrick, Gluck, Hayden & Cole, Teaneck, NJ, for Division of State Police, Col. Clinton Pagano, Col. Michael Fedorko and Attorney General John J. Farmer.

George W. Fisher, Zuckerman & Fisher, Princeton, NJ, for Col. Carl A. Williams.

Frank M. Ciuffani, Donna A. McBarron, David B. Noble, Wilentz, Goldman & Spitzer, Woodbridge, NJ, for New Jersey Turnpike Authority.

Robert A. Mintz, Adam N. Saravay, McCarter & English, Newark, NJ, for Justice Peter G. Verniero.

### OPINION

PISANO, District Judge.

## I. INTRODUCTION

This is the latest round in the "racial profiling" litigation which has consumed New Jersey's State and Federal Courts for the better part of six years[1]. Specifically, the individually named Plaintiffs, three African–American men who were stopped on the New Jersey Turnpike ("Turnpike") allegedly on the basis of their race, filed this civil rights action on behalf of themselves, and a class of similarly situated individuals, alleging that Defendants violated their civil rights through conducting, endorsing and covering up the State Police's practice of "racial profiling" on the Turnpike.

Presently before the Court is Plaintiffs' motion for class certification pursuant to Fed R. Civ. P. ("Rule") 23(b)(3). The motion presents a moving target, in that, Plaintiffs' moving papers include two separate definitions of the proposed class. First, the Motion for Class Certification defines the proposed class as "comprising all persons of color who for the period of January 1, 1993 through April 3, 2001 were subjected to stops, detention and/or searches on the New Jersey Turnpike by the New Jersey State Police in violation of the Fourth and Fourteenth Amendments to the United States Constitution." (Motion for class certification). On the other hand, the proposed Order includes the much broader definition of "[a]ll persons of color who were stopped, detained, and/or searched by New Jersey State Police on the New Jersey Turnpike for the period January 1, 1993 through April 3, 2001." (Proposed Order).

Defendants filed opposition. The Court decides this motion without oral argument pursuant to Rule 78. The motion for class certification is denied because Plaintiffs' proposed definition of the class is overly broad, amorphous and vague. Further, even if Plaintiffs had clearly defined a class, its certification would be inappropriate because individual issues unique to each individual plaintiff's claim predominate over the issues common to all members of the proposed class. Finally, Plaintiffs cannot demonstrate that handling this matter as a class action is superior to resolving it through traditional litigation.

## II. BACKGROUND[2]

### A. Procedural History

Plaintiffs Thomas White ("White"), John McKenzie ("McKenzie"), Frederick Hamiel ("Hamiel"), Tyrone Hamilton ("Hamilton") and the South Burlington County Branch, National Association for the Advancement of Colored People ("NAACP") commenced this action on May 14, 1999, alleging various claims against Defendants, the Department of Law and Public Safety–Division of State

---

1. *See White v. Williams,* 179 F.Supp.2d 405 (D.N.J.2002); *United States v. State of New Jersey & Div. of State Police of the New Jersey Dep't of Law & Pub. Safety,* No. 99–5970 (D.N.J. Dec. 30, 1999); *Bellaran v. Division of State Police,* No. 91–4256 (D.N.J. Mar. 28, 1998); *State v. Velez,* 167 N.J. 625, 772 A.2d 929 (2001); *State v. Jones,* 167 N.J. 627, 772 A.2d 930 (2001); *State v. Chapman,* 167 N.J. 624, 772 A.2d 928 (2001); *State v. Moore,* 164 N.J. 557, 753 A.2d 1151 (2000); *State v. Harvey,* 159 N.J. 277, 731 A.2d 1121 (1999); *Hornberger v. American Broadcasting Co., Inc.,* 351 N.J.Super. 577, 799 A.2d 566 (App.Div.2002); *Freeman v. N.J.,* 347 N.J.Super. 11, 788 A.2d 867 (App.Div.2002); *State v. Clark,* 345 N.J.Super. 349, 785 A.2d 59 (App.Div.2001); *State v. Payton,* 342 N.J.Super. 106, 775 A.2d 740 (App.Div.2001); *State v. Francis,* 341 N.J.Super. 67, 775 A.2d 79 (App.Div.2001); *State v. Halsey,*

340 N.J.Super. 492, 774 A.2d 693 (App.Div. 2001); *State v. Yanovsky,* 340 N.J.Super. 1, 773 A.2d 711 (App.Div.2001); *State v. Hogan,* 336 N.J.Super. 319, 764 A.2d 1012 (App.Div.2001); *State v. Ross,* 335 N.J.Super. 536, 763 A.2d 281 (App.Div.2000); *State v. Velez,* 335 N.J.Super. 552, 763 A.2d 290 (App.Div.2000); *State v. Williamson,* 335 N.J.Super. 544, 763 A.2d 285 (App. Div.2000); *State v. Hampton,* 333 N.J.Super. 19, 754 A.2d 567 (App.Div.2000); *Morka v. State of New Jersey,* No. L–8429–97 (N.J.Super.Ct.Law.Div. Oct. 5, 2000); *Davis v. New Jersey Dep't. of Law & Public Safety, Division of State Police,* 327 N.J.Super. 59, 742 A.2d 619 (Law Div.1999); *State v. Soto,* 324 N.J.Super. 66, 734 A.2d 350 (Law Div.1996).

2. A more detailed recitation of the allegations are contained in this Court's Opinion dated January 9, 2002 located at *White,* 179 F.Supp.2d at 405.

Police ("State Police"), the New Jersey Turnpike Authority ("Turnpike Authority"), Col. Carl A. Williams ("Williams"), Col. Clinton Pagano ("Pagano"), Col. Michael Fedorko ("Fedorko"), Justice Peter Verniero ("Verniero") and Attorney General John J. Farmer, Jr.("Farmer"), related to the State Polices' practice of racial profiling on the Turnpike. An Amended Complaint containing five counts was filed on June 22, 1999 [3]. On November 3, 1999, Judge Irenas placed this matter on administrative suspension pending the outcome of class certification issues in the related State Court case *Morka v. State of New Jersey*, No. L–8429–97 (N.J.Super.Ct.Law.Div. Oct. 5, 2000). After the Superior Court denied class certification in *Morka*, this case was reopened on January 25, 2001. It was reassigned to the undersigned on April 3, 2001.

Thereafter, various motions to dismiss pursuant to Rule 12(b)(6) and motions for summary judgment pursuant to Rule 56 were filed by various Defendants including Verniero, the State Police, the Turnpike Authority, Pagano, Fedorko and Farmer. On November 14, 2001, this Court entered a consent order dismissing with prejudice Counts two (§ 1981), three (§ 1985) and four (§ 1986) as to defendant Pagano and Count four (§ 1986) as to defendant State Police. On November 19, 2001, counsel for defendant Williams entered an appearance.

On January 9, 2002, this Court granted in part and denied in part defendants' motions to dismiss and for summary judgment. *White v. Williams*, 179 F.Supp.2d 405 (D.N.J.2002). Specifically, the Court denied Defendants' motion to dismiss Counts one (§ 1983), three (§ 1985) and four (§ 1986) [4]

and granted Verniero's motion to dismiss Count two (§ 1981) and Defendants' motion to dismiss Count five (Title VII injunctive relief). *Id.* at 424–25. Therefore, the following counts remain: "Count one (§ 1983) as to defendants Williams, Pagano and Verniero; Count two (§ 1981) as to Williams; Count three (§ 1985) as to Williams and Verniero; Count four (§ 1986) as to Williams, Verniero and the Turnpike Authority." *Id.* The Opinion dismissed all claims as to Farmer, Fedorko, and the State Police. In addition it dismissed all claims filed by the NAACP. *Id.*

Thereafter, Answers were filed by Pagano and Verniero. The instant motion followed.

## B. Proposed Class Representative's Individual Claims [5]

### i. White

White, a retired Philadelphia corrections officer, complains of two instances of "racial profiling" that occurred one month apart in 1998. (amend compl.). First, White alleges that in May 1997, he was stopped by an unidentified Caucasian trooper for erratic driving while traveling northbound on the Turnpike in the vicinity of exit 7. (amend. compl.¶ 21). After the trooper inspected White's license, registration and insurance policy, the trooper sought White's consent to search the vehicle. (White dep. at 17). White consented and the trooper searched the car and found nothing. White acknowledged that, throughout the stop, the trooper was polite and respectful toward him, but he viewed the politeness to be a veneer. White recalled "[h]e was using the term sir a lot, but between the sirs, I could hear the arro-

---

**3.** Count One, Two and Three assert claims against Defendants Williams, Pagano and Verniero pursuant to 42 U.S.C. §§ 1983, 1981 and 1985 respectively. Count Four applies to the same Defendants, as well as, the State Police and the Turnpike Authority and asserts a claim pursuant to 42 U.S.C. § 1986. Finally, Count Five applies to all Defendants and asserts a claim for injunctive relief pursuant to 42 U.S.C. § 2000d.

**4.** Plaintiffs' brief inartfully represents that the Court "sustained" these claims. (Pl. br. at 6). Of course, the denial of a motion to dismiss an action under Rule 12(b)(6) does nothing of the sort. *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1420 (3d Cir.1997)(holding in the

context of Rule 12(b)(6) that "[t]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims."). Suffice it to say, in denying the motion to dismiss, and in denying this motion, the Court should not be heard to express an opinion on the merits of the claims of the three named Plaintiffs.

**5.** Plaintiff John McKenzie has entered a voluntary stipulation of dismissal without prejudice reserving his right to pursue a claim as a class member if a class settlement or award is made. (Stipulation of dismissal dated April 3, 2002).

gance in his voice." (White dep. at 23). White was not personally searched. (White dep. at 21). The trooper released him without issuing a citation.

Approximately one month later, White was again stopped by a different unnamed Caucasian trooper for erratic driving. (amend. compl.¶ 22). At the time of this stop, White was traveling northbound on the Turnpike in the vicinity of exit 9. (amend.compl.¶ 22). Like the first stop, the trooper checked White's license, registration and insurance information, before seeking White's consent to search the trunk. (White dep. at 32). White consented, the trooper searched the trunk and found no evidence of criminality. (amend.compl.¶ 22). White was released without being issued a citation.

White testified at his deposition that as a result of these incidents he has suffered mental harm. (White dep. at 51–52). White recalled that he suffered "anger and frustration. I mean, I know that I was driving safely, responsibly, and I know there was no reason for them to pull me over other than the fact that the color of my skin, and I was totally angry." (White dep. at 52). White has not sought medical treatment as a result of these stops.

### ii. Hamiel

Hamiel, a retired hair salon owner, who resides in Virginia Beach complains of two "racial profiling stops," the first occurred in December 1998 and the second occurred in March 1999. (Hamiel dep. at 7, 28).

The first stop occurred when Hamiel was traveling southbound on the Turnpike in the vicinity of exit 13. (Hamiel dep. at 13). Hamiel testified that he did not pull over for three or four minutes after the trooper turned on his overhead lights, because he did not believe there was any reason for him to be stopped since he was only traveling at approximately 60 m.p.h. (Hamiel dep. at 13–18). Hamiel only pulled over after the trooper shined a searchlight on his car. (Hamiel dep. at 17). Before the trooper approached Hamiel's car, Hamiel got out of his vehicle to approach the trooper. Thereafter, the trooper ordered Hamiel to get back into his car. (Hamiel dep. at 18).

Approximately, three minutes later, the trooper approached Hamiel and asked for his license and registration. (Hamiel dep. at 19). At this point Hamiel asked the trooper why he was stopped. The trooper did not answer the question. (amend.compl.¶ 25). Hamiel recalled that when the trooper asked him, where he was headed, he "got a little smart and [he] said, it's none of your business but I was coming from a fishing trip." (Hamiel dep. at 20). The trooper then instructed Hamiel and his passenger to exit the vehicle. (Hamiel dep. at 22–23). The trooper searched the interior by shining a flashlight into it, and then ordered Hamiel to get back into his vehicle. Neither Hamiel or his passenger were patted down or frisked. (Hamiel dep. at 24). The trooper did not issue a citation. (amend.compl.¶ 25).

The second stop occurred in March 1999, when Hamiel was stopped by an unidentified white trooper in the vicinity of exit 8 on the Turnpike. (amend.compl.¶ 24). At the time of the stop, Hamiel's brother was a passenger in the vehicle. (amend.Compl.¶ 24). As the trooper approached the vehicle, Hamiel inquired as to why he had been stopped. The trooper responded "shut the fuck up and give me your papers." (Hamiel dep. at 29). The trooper then called for back up. (Hamiel dep. at 35). After the second trooper arrived, the troopers ordered Hamiel and his brother to get out of the vehicle. Hamiel complied but asked the trooper if it was necessary for his brother to get out of the car because his leg was in a cast. Hamiel asserts that the trooper responded with vulgarities and again ordered both men to get out of the vehicle. The trooper ordered the two men against the car, frisked them, and then directed them to stand alongside the guardrail while he searched the vehicle. The trooper did not seek Hamiel's consent prior to searching the vehicle. (Hamiel dep. at 42–47). The search proved futile, and Hamiel was released without being issued a citation. (Hamiel dep. at 47). This stop lasted approximately twenty-five minutes. (Hamiel dep. at 47).

Hamiel has sought medical treatment for high blood pressure and angina, allegedly as

a result of this incident. (Hamiel dep. at 49–50). Hamiel explained "[m]y pressure was astronomical after this. I mean I've been in the hospital a couple of times because of the stress." (Hamiel dep. at 49–50).

### iii. Hamilton

Hamilton, a Union County Juvenile Detention Officer, complains of "racial profiling" related to two traffic stops that occurred minutes apart on December 2, 1998, on the Turnpike in the vicinity of exit 5. (amend. compl.¶ 26). The first stop occurred when an unidentified trooper stopped Hamilton for speeding. However, after the trooper learned that Hamilton was a Juvenile Detention Officer, he released Hamilton without issuing him a citation. The trooper never requested or conducted a search of the vehicle. (Hamilton dep. at 19).

Several minutes later, Hamilton was stopped by a second trooper, Anthony Duckett, an African–American, for speeding. (McLaughlin Cert. at ¶ 7). Hamilton says he told the trooper that he had just been stopped. The trooper then asked him if the other trooper had ticketed him. Hamilton said no, and the trooper told him that he would be receiving a ticket. (Hamilton dep. at 31).

After, the trooper returned to his vehicle, Hamilton approached him to ask about the calculation of the fine. (amend.compl.¶ 27). As the trooper was explaining the fine he received a radio call from the first trooper who explained that Hamilton was Juvenile Detention Officer. (Hamilton dep. at 32). Thereafter, the trooper asked Hamilton why he had not told him that he was a law enforcement officer before he wrote the ticket. The trooper then apologized and said that the ticket could not be rescinded once it was written. (Hamilton dep. at 34).

Neither Hamilton, nor his vehicle were searched. (Hamilton dep. at 62). Hamilton has not sought medical or psychological treatment as a result of this incident. (Hamilton dep. at 62).

### C. Morka v. State of New Jersey

The instant matter is not the first putative class action to be brought regarding racial profiling. The complaint in *Morka v. State of New Jersey, et al.,* No. L–8229–97 (N.J. Sup.Ct. Law Div. Oct. 5, 2000), was brought on behalf of all minority motorists who have been or will be subject to racially motivated stops on the Turnpike since 1988. The *Morka* case sought class certification for both damages and injunctive relief.

The proposed class representatives included a black Nigerian national male, an Egyptian–American female, an African–American couple, and a number of African–American men, all of whom were stopped on the Turnpike. Some were allegedly stopped for speeding, while others were stopped for moving violations such as failing to signal before changing lanes. Some had their vehicles searched, while others did not. Some were issued tickets others were not. *Id.* at 2. The named defendants included the State of New Jersey, the Turnpike Authority, the State Police, and the two individual State troopers that effectuated the stop. *Id.*

The *Morka* plaintiffs contended that they were victims of the trooper's selective enforcement of the traffic laws based upon their ethnicity since they were traveling with the flow of traffic when they were stopped. *Id.*

The Law Division found that class certification was not appropriate. The court concluded that the plaintiffs had established the prerequisites for class certification—numerosity, commonality, typicality and adequacy of representation—but failed to demonstrate that common issues predominated the individual issues present in each class member's claims. *R.* 4:32–1(b)(3); *Id.* at 8. The court reasoned:

In the present case, before a finding of liability and an award of damages could be made to any individual class member, an analysis would have to be made of the stop involving that class member—the factors that triggered each stop and what happened at each stop. A look at the claims of the proposed class representatives gives some idea of the wide variety of ' circumstances involved in these stops. Some

were committing traffic violations, others were not; some were given tickets, others were not; some were stopped on only one occasion, others experienced multiple stops; some were either verbally or physically abused, others were not; some were subjected to searches either of their vehicle or their person, others were not; some were detained for lengthy periods of time, others were not.

*Id.* at 16. The court concluded that class certification would not provide a better method to resolve the plaintiffs' claims than traditional litigation. *Id.*

Similarly, the court concluded that class certification to allow for injunctive relief, pursuant to R. 4:32–1(b)(2), was inappropriate. This determination was made in deference to the Consent Decree that the State entered into with the United States Department of Justice in *United States v. New Jersey,* supra. *Id.* at 23. The court recognized the Consent Decree's broad scope and opined that additional injunctive relief may in fact be counterproductive, explaining that "it would be difficult for the courts to avoid bumping into each other in the attempt to address the same problem." *Id.* The court noted that this ruling did not prevent it from granting injunctive relief to the individual named plaintiffs, which could still have the effect of enjoining the State Police. *Id.*

## III. DISCUSSION

A class action is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Califano v. Yamasaki,* 442 U.S. 682, 700 701, 99 S.Ct. 2545, 61 L.Ed.2d 176 (1979). Class actions preserve "the resources of both the courts and the parties by permitting an issue potentially affecting every [class member] to be litigated in an economical fashion under Rule 23." *General Telephone Co. of Southwest v. Falcon,* 457 U.S. 147, 155, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982)(quoting *Califano,* 442 U.S. at 700–01, 99 S.Ct. 2545).

### A. Plaintiffs Proposed Class is Not Clearly Defined

Class certification presupposes the existence of an actual "class." That is, the pro-

posed class must be sufficiently identifiable without being overly broad. *In re School Asbestos Litigation,* 56 F.3d 515, 519 (3d Cir.1995). The proposed class may not be "amorphous, vague, or indeterminate" and it must be "administratively feasible to determine whether a given individual is a member of the class." *Mueller v. CBS, Inc. f/k/a Westinghouse, Inc.,* 200 F.R.D. 227, 233 (W.D.Pa.2001)(quoting *In re Tetracycline Cases,* 107 F.R.D. 719, 728 (W.D.Mo.1985)).

■ In this case, both of Plaintiffs' proposed class definitions are amorphous and vague. The definition provided in the proposed Order, "[a]ll persons of color who were stopped, detained, and/or searched by New Jersey State Police on the New Jersey Turnpike for the period January 1, 1993 through April 3, 2001," is overly broad. This definition attempts to join together all minority persons who were stopped, detained and/or searched on the Turnpike during an eight year period. This definition has nearly no parameters. It spans nearly a decade in time, a period involving several State Police Superintendents, some named as defendants, some not, three administrations and includes no geographic distinctions. Furthermore, this definition does not attempt to distinguish between persons who were breaking a traffic law when they were stopped and those who were not. Finally, this definition fails to distinguish between those who received citations and those who did not, and people who had their vehicles searched and those who did not.

Similarly, Plaintiffs attempt to narrow the class in its second definition fails to make the class less vague. This more narrow definition provided in the Plaintiffs' motion papers which essentially adds the phrase "in violation of the Fourth and Fourteenth Amendments to the United States Constitution" is also vague. First, this definition suffers from the same infirmities as the broader definition discussed above. Second, use of this definition would require a putative plaintiff to establish the merits of his or her claim before being included in the class. Adoption of this definition would require the Court to conduct a number of mini-trials or to employ some other screening mechanism prior to

defining the class. *See Sanneman v. Chrysler Corp.*, 191 F.R.D. 441, 445 (E.D.Pa.2000); *Forman v. Data Transfer, Inc.*, 164 F.R.D. 400, 403 (E.D.Pa.1995)(finding a proposed class definition untenable because it required the court to address the claim's "central issue of liability."). Therefore, it is not a proper limitation on the scope of the class.

Since Plaintiffs proposed class definition is amorphous and vague, class certification is not appropriate.

## B. Rule 23

To obtain class certification, in an action for damages, the proposed class representatives must define a class that satisfies the requirements of Rule 23(a) and 23(b)[6]. *Stewart v. Abraham*, 275 F.3d 220, 225 (3d Cir.2001). The four prerequisites of Rule 23(a), are commonly known as: (1) numerosity, (2) commonality, (3) typicality and (4) adequacy of representation. *Id.* If these prerequisites are satisfied, the plaintiff may demonstrate that a class action is maintainable under Fed.R.Civ.P. 23(b)(1), (2) or (3). *Stewart*, 275 F.3d at 225. In this case, the lead Plaintiffs have moved for class certification on behalf of the class under Rule 23(b)(3)[7], which provides for certification in

cases where common issues "predominate" over issues unique to the individual claimants and where litigation of the matter as a class action is "superior" to traditional forms of litigation. *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 621, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997).

■ A Plaintiff who seeks to have a class action certified bears the burden of establishing that the requirements of Rule 23 are satisfied. *Lewis v. Casey*, 518 U.S. 343, 357, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996). The Court must undertake a "rigorous analysis" to ensure that the putative class and its proposed representative satisfy each of the prerequisites to class certification. *General Tel. Co. v. Falcon*, 457 U.S. 147, 161, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982).

■ Assuming for the purpose of this motion, that Plaintiffs, if given the opportunity, would be able to amend the proposed class definition in a fashion that would not be overly broad or vague, Plaintiffs would still not be entitled to class certification. Common issues do not predominate the issues unique to individual class members' claims. Further, dealing with this matter as a class action would not be superior to resolving the matter with traditional forms of litigation.[8]

6. Fed.R.Civ.P. 23(a) provides:
   (a) Prerequisites to a Class Action. One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and(4) the representative parties will fairly and adequately protect the interests of the class.
   (b) Class Actions Maintainable. An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition: ...

7. Fed.R.Civ.P. 23(b) provides in pertinent part:
   An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:
   
   .    .    .    .    .
   
   (3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include:

(A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

8. If the Plaintiffs were given the opportunity to amend this motion to include a more narrow definition of the proposed class it is likely they would likely be able to satisfy the prerequisites of Rule 23(a) including: numerosity, commonality, typicality and adequacy of representation. *Morka*, slip op. at 8–11; *Johnston v. HBO Film Management, Inc.*, 265 F.3d 178, 184 (3d Cir. 2001); *Baby Neal v. Casey*, 43 F.3d 48, 55 (3d Cir.1994). The common issue is whether the defendants "engaged in an illegal pattern and practice of discrimination." *Id.* The named plaintiffs claims are typical because they assert that they were wrongfully stopped on the turnpike because of discrimination. *Id.* at 9. Finally, the proposed class counsel are all qualified and experienced with class action litigation and it

Class certification pursuant to Rule 23(b)(3) requires proposed class representatives to establish both predominance and superiority. *Newton,* 259 F.3d at 186. A finding of predominance requires the Court to conclude "that questions of law or fact common to the members of the class predominate over any questions affecting only individual members." *Id.* (quoting Fed.R.Civ.P. 23(b)(3)). Whereas superiority requires "a determination that a class action is the best method of achieving a 'fair and efficient adjudication of the controversy.'" *Id.* The plain language of Rule 23(b)(3) includes a nonexclusive list of relevant factors that help the court make this determination:

(A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

Fed.R.Civ.P. 23(b)(3).

Rule 23(b)(3) was adopted to "cover cases in which a class action would achieve economies of time, effort, and expense. And promote ... uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results ... [which] ... invite[ ] a close look at the case before it is accepted as a class action." *Id.* (quoting *Amchem,* 521 U.S. at 615, 117 S.Ct. 2231).

### i. Predominance

To establish predominance, Plaintiffs must establish "that questions of law or fact common to the members of the class predominate over any questions affecting only individual members." Fed.R.Civ.P. 23(b)(3). Although the predominance requirement is similar to the commonality requirement found in Rule 23(a), it is a significantly more demanding burden to satisfy. In sum,

does not appear that any of the named Plaintiffs have interests that are antagonistic to other class

"[p]redominance measures whether the class is sufficiently cohesive to warrant certification." *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 259 F.3d 154, 187 (3d Cir.2001).

The Third Circuit has explained that class certification is inappropriate in cases that require an individualized finding of liability. *Johnston v. HBO Film Management, Inc.,* 265 F.3d 178, 188 (3d Cir.2001) (citations omitted); *accord Barnes v. The American Tobacco Co.,* 161 F.3d 127, 149 (3d Cir.1998)(finding that individual issues predominated the common issues in cigarette litigation); *Georgine v. Amchem Prods., Inc.,* 83 F.3d 610, 624 (3d Cir.1996)(finding that individual issues predominated in asbestos litigation). Similarly, in *Amchem,* the Court concluded that "individualized issues can become overwhelming in actions involving long-term mass torts." 83 F.3d at 628. In *Newton,* a putative securities fraud class action, the Court concluded that individual issues predominated because distinct facts among the thousands of plaintiffs involving millions of trades would have to be considered individually to determine whether a securities violation has occurred. 259 F.3d at 187. Finally, in *Universal Calvary Church v. City of New York,* 177 F.R.D. 181, 183 (S.D.N.Y. 1998), the Court concluded that individual issues predominated, defeating class certification in a police brutality case. That Court reasoned:

The series of interactions between individual plaintiffs and individual police officers will raise issues of fact and law specific to each interaction, and the defendants' liability will vary accordingly. Trial will raise questions of liability such as whether each particular action was justified, or whether there is evidence that a particular action involved the use of excessive force or was racially motivated. Moreover, the damages suffered by the plaintiffs will vary depending on such factors as the level of force used in each instance, the extent of false imprisonment to which each plaintiff

members. *Id.* at 10–11.

was subjected, the extent of each plaintiff's exposure to mace, and so on.

*Id.*

In the instant case, Plaintiffs acknowledge that differences exist between the injuries suffered by various members of the proposed class and the amount of damages they are each entitled to recover. However, Plaintiffs assert that "commonality of the core legal theory of liability will predominate" over these differences. (Pl. br. at 13). Plaintiffs state that "all questions of law are common. The allegations make clear that the defendants acted in a common and consistent manner with respect to all class members they advocated, concealed or deliberately ignored racial profiling, and they failed to take steps within their authority to protect the plaintiff class from this unconstitutional practice." (Pl. br. at 14).

However, even if the Plaintiffs are able to establish these facts, a number of individual determinations would have to be made in order to determine whether a discriminatory intent motivated the stop of each class member. In fact, before any class member would be able to recover, the Court would have to examine what motivated each stop and what occurred at each stop. Relevant factors would include: the troopers who conducted the stop, whether that Plaintiff was violating the traffic laws, how long the plaintiff was detained and the length of that detention, whether the trooper used intimidation, whether the Plaintiff's vehicle was searched, and if that search was voluntary. Further, the fact finder would have to consider whether the plaintiff was issued a citation, and whether it was a valid citation. As the *Morka* Court explained:

> Before a finding of liability and an award of damages could be made to any individual class member, an analysis would have to be made of the stop involving that class member—the factors that triggered each stop and what happened at each stop. A look at the claims of the proposed class representatives gives some idea of the wide variety of circumstances involved in these stops.

   .      .      .      .      .

> Significantly, different troopers, with varied backgrounds and work experiences were involved in the stops. Resolution of each claim will turn on whether the troopers involved in the stop under consideration intended to discriminate. The issue of discriminatory intent is critical to a finding of liability. Resolution of that issue involves the weighing of multiple factors, including the circumstances surrounding the decision to stop the class member, what happened during the stop and the credibility of the witnesses. These individual determinations would have to be made with respect to each class member.

*Morka,* Slip op. at 16–17.

Plaintiffs are unable to establish that common issues predominate, therefore, class certification pursuant to Rule 23(b)(3) is not appropriate.

### ii. Superiority

To establish superiority, a Plaintiff must demonstrate that a class action is the best method of achieving a "fair and efficient adjudication of the controversy." *Newton,* 259 F.3d at 186. In this context, the district court must consider "the difficulties likely to be encountered in the management of a class action." Fed.R.Civ.P. 23(b)(3)(D). For class certification to be appropriate, the court must conclude that a class action is "the best 'available method[ ] for the fair and efficient adjudication of the controversy.'" *Newton,* 259 F.3d at 190. The superiority requirement asks the court "to balance, in terms of fairness and efficiency, the merits of a class action against those of 'alternative available methods' of adjudication." *In re the Prudential Ins. Co. of Am. Sales Practices Lit.,* 148 F.3d 283, 316 (3d Cir.1998)(quoting *Georgine,* 83 F.3d at 632).

In this case, Plaintiffs argue that class certification is superior to other forms of litigation because, if certification is denied, "additional individuals who come forward to stake claims for race-based stops and searches would need to file suit, either seeking to join the present case or filing new cases. There would need to be a series of trials with the risk of repetitive presentation

of a large mass of evidence, and possible inconsistent results." (Pl. br. at 20).

Plaintiffs propose a two phase approach for the management of this case based upon the model endorsed by the Supreme Court in *Int'l Brotherhood of Teamsters v. United States,* 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977), for use in the employment law context. (Pl. br. at 21). First, the Court would conduct a class wide liability phase, where the Plaintiffs would utilize the *McDonnell Douglas*[9] burden shifting paradigm to attempt to establish that Defendants operated under a race based policy in violation of the Fourteenth Amendment. (Pl. br. at 21–23). If the jury found that the Plaintiffs had fulfilled their burden, it would create a presumption that each member of the class was subject to the discriminatory practice. (Pl. br. at 23).

The second phase of the proposed litigation, would then be subdivided into two additional phases: the first dealing with compensatory damages and the second with punitive damages. (Pl. br. at 24). In this phase "defendant[s] have 'not only the burden of production, but also the burden of persuading the trier of fact that it is more likely than not' that defendants did not unlawfully discriminate against the individual." (Pl. br. at 24)(quoting *Craik v. Minnesota State Univ. Bd.,* 731 F.2d 465, 470 (8th Cir.1984)). Plaintiffs explain, in a footnote, that if the case did not settle after liability was established the Court could consider "streamlined procedures" for resolving individual class members claims including "consolidated trials before a magistrate or panel of judges" or abbreviated procedures before a Special Master. (Pl. br. at 24 n. 13).

Plaintiffs own model illustrates that class certification of this matter is not superior to traditional forms of litigation as a means of resolving this matter. If the Court followed Plaintiffs' model it would still have to conduct a mini-trial for each individual proposed class member to determine if they are members of the class and if they are, what their damages would be. Ultimately, the only affect of the Plaintiffs' proposed structure is to transfer the burden to the Defendants to establish that an individual Plaintiff was not the victim of racial profiling. This proposed plan is not efficient and would be likely to consume even more of the Court's time than trying each class member's claims individually. *Sanneman v. Chrysler Corp. n/k/a DaimlerChrysler Corp.,* 191 F.R.D. 441, 455 (E.D.Pa.2000).

Plaintiffs cannot establish that resolving this case through a class action would be superior to traditional litigation, therefore, class certification pursuant to Rule 23(b)(3) is inappropriate.

## IV. CONCLUSION

For the reasons set forth above, the Court denies Plaintiffs' motion for class certification. An appropriate order is attached.

---

9. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).